**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

COUNTY OF COOK,

       Plaintiff,

v.

HSBC NORTH AMERICA HOLDINGS INC.,
ET AL.,

       Defendants.

Case No.:     1:14-cv-2031

District Judge John Z. Lee

Magistrate Judge Sheila M. Finnegan

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

# **TABLE OF CONTENTS**

Page(s)

INTRODUCTION ........................................................................................................... 1

RELEVANT BACKGROUND ....................................................................................... 3

ARGUMENT .................................................................................................................. 5

I.      THE COUNTY'S CLAIM IS UNTIMELY. ...................................................... 5

     A.  The County's Claim Is Time-Barred By The Two-Year Statute of Limitations. ......... 5

     B.  The Continuing Violation Doctrine Does Not Apply. ................................................. 6

          1.  The Complaint Alleges No Discriminatory Act Within The Past Two Years. ....... 6

          2.  The County Was Aware Of Its Claim More Than Two Years Before Filing. ........ 8

     C.  The Complaint Should Be Dismissed With Prejudice. ............................................... 10

II.     THE COUNTY DOES NOT HAVE STANDING. ......................................................... 10

     A.  The County Does Not Have Standing Under Article III. ........................................... 10

     B.  The County Does Not Have Statutory Standing Under *Lexmark*. ............................. 13

III.   THE COUNTY HAS NOT STATED A CLAIM FOR RELIEF .................................... 17

     A.  The Fair Housing Act Does Not Recognize Disparate Impact Claims. ...................... 17

     B.  The County Has Not Pled A Disparate Impact Claim. ............................................... 18

     C.  The County Has Not Pled A Disparate Treatment Claim. .......................................... 19

IV.   NON-ORIGINATING ENTITIES SHOULD BE DISMISSED .................................... 19

CONCLUSION ............................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. Wright*,
    468 U.S. 737 (1984) ................................................................................... 11, 12

*APS Sports Collectibles, Inc. v. Sports Time, Inc.*,
    299 F.3d 624 (7th Cir. 2002) ............................................................................. 20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................................... 13

*Bardney v. United States*,
    151 F.3d 1032 (7th Cir. 1998) ............................................................................. 3

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................... 13

*Brandt v. Vill. of Chebanse*,
    82 F.3d 172 (7th Cir. 1996) ................................................................................. 8

*Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*,
    230 F.3d 934 (7th Cir. 2000) ............................................................................. 20

*Cervantes v. Countrywide Home Loans, Inc.*,
    No. CV 09-517-PHXJAT, 2009 U.S. Dist. LEXIS 87997 (D. Az. Sept. 24, 2009) .................. 7

*City of Birmingham v. Citigroup, Inc.*,
    No. CV-09-BE-467-S, 2009 U.S. Dist. LEXIS 123123 (N.D. Ala. Aug. 19, 2009) ........... 9, 11

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.*,
    621 F. Supp. 2d 513 (2009) ............................................................................. 9, 12

*City of Los Angeles v. Wells Fargo & Co.*,
    No. 2:13-cv-9007-ODW(RZx) (C.D. Ca. May 28, 2014) ....................................... 12

*City of Memphis v. Wells Fargo Bank, N.A.*,
    No. 09-02857-STA, U.S. Dist. LEXIS 48522 (W.D. Tenn. May 4, 2011) .................... 9, 12

*Cohen v. Am. Sec. Ins. Co.*,
    735 F.3d 601 (7th Cir. 2013) ............................................................................... 3

*Davenport v. Litton Loan Servicing, LP*,
    725 F. Supp. 2d 862 (N.D. Cal. 2010) ................................................................... 7

ii

*Deicher v. City of Evansville,*
  545 F.3d 537 (7th Cir. 2008) ................................................................................. 3

*DeKalb Cnty. v. HSBC N. Am. Holdings,*
  No. 1:12-cv-03640-SCJ, 2013 U.S. Dist. LEXIS 185976 (N.D. Ga. Sept. 24, 2013) ............. 12

*Del Amora v. Metro Ford Sales & Serv., Inc.,*
  206 F. Supp. 2d 947 (N.D. Ill. 2002) ..................................................................... 20

*DT Apt. Grp., LP v. CWCapital, LLC,*
  No. 3:12-CV-0437-D, 2012 U.S. Dist. LEXIS 181741 (N.D. Tex. Dec. 26, 2012) ................ 16

*Edwards v. Lake Terrace Condo. Ass'n,*
  No. 1:10-cv-2986, 2011 U.S. Dist. LEXIS 43304 (N.D. Ill. Apr. 21, 2011) ...................... 8

*EEOC v. Chi. Miniature Lamp Works,*
  947 F.2d 292 (7th Cir. 1991) ................................................................................ 19

*EEOC v. N. Gibson Sch. Corp.,*
  266 F.3d 607 (7th Cir. 2001) ................................................................................. 6

*Estate of Davis v. Wells Fargo Bank,*
  633 F.3d 529 (7th Cir. 2011) ............................................................................ 5, 8

*Evans v. Vocamotive, Inc.,*
  No. 11-c-8197, 2012 U.S. Dist. LEXIS 133599 (N.D. Ill. Sept. 18, 2012) ...................... 10

*Farrar v. Eldibany,*
  137 F. App'x 910 (7th Cir. 2005) ........................................................................... 8

*Gladstone, Realtors v. Vill. of Bellwood,*
  441 U.S. 91 (1979) ............................................................................... 14, 15, 16

*Grimes v. Fremont Gen. Corp.,*
  785 F. Supp. 2d 269 (S.D.N.Y. 2011) ....................................................................... 5

*Hafiz v. Greenpoint Mortg. Funding, Inc.,*
  652 F. Supp. 2d 1039 (N.D. Cal. 2009) ................................................................. 19-20

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (U.S. 1982) ........................................................................ 14, 15, 16

*Hein v. Freedom From Religion Found., Inc.,*
  551 U.S. 587 (2007) ............................................................................................ 11

*Hernandez v. Sutter W. Capital*,
　No. C 09-03658 CRB, 2010 U.S. Dist. LEXIS 88109 (N.D. Ca. Aug. 26 2010) ..................... 7

*Hoffman v. Option One Mortg. Corp.*,
　589 F. Supp. 2d 1009 (N.D. Ill. 2008) ................................................................ 18

*Johnson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
　719 F.3d 601 (7th Cir. 2013) .................................................................... 10, 13

*Jones v. Countrywide Home Loans, Inc.*,
　No. 09 C 4313, 2010 U.S. Dist. LEXIS 11846 (N.D. Ill. Feb. 11, 2010) ............................... 20

*Jorman v. Veterans Admin.*,
　500 F. Supp. 460 (N.D. Ill. 1980) ................................................................. 14

*Kamelgard v. Macura*,
　585 F.3d 334 (7th Cir. 2009) ..................................................................... 10

*King v. Ameriquest Mortg. Co.*,
　No. PJM 09-977, 2009 U.S. Dist LEXIS 102270 (D. Md. Oct. 30, 2009) .............................. 7

*Knox v. Cook Cnty. Sheriff's Police Dep't*,
　866 F.2d 905 (7th Cir. 1988) ....................................................................... 6

*La Playita Cicero, Inc. v. Town of Cicero*,
　No. 11-cv-1702, 2014 U.S. Dist. LEXIS 31070 (N.D. Ill. Mar. 11, 2014) (Lee, J.) .............. 6, 8

*Laborers' Pension Fund v. Lay-Com, Inc.*,
　580 F.3d 602 (7th Cir. 2009) ...................................................................... 20

*Lexmark International, Inc. v. Static Control Components, Inc.*,
　134 S. Ct. 1377 (2014) ....................................................................... *passim*

*Limestone Dev. Corp. v. Vill. of Lemont, Ill.*,
　520 F.3d 797 (7th Cir. 2008) ....................................................................... 6

*Lujan v. Defenders of Wildlife*,
　504 U.S. 555 (1992) ...................................................................... 10, 11, 12, 13

*Lyons v. First Am. Title Ins. Co.*,
　No. C 09-4156 PJH, 2009 U.S. Dist. LEXIS 119859 (N.D. Cal. Dec. 22, 2009) ..................... 7

*Magner v. Gallagher*,
　132 S. Ct. 548 (2011) .............................................................................. 18

*Mayor of Baltimore v. Wells Fargo Bank, N.A.,*
   677 F. Supp. 2d 847 (2010) ........................................................................... 9, 12

*McReynolds v. Merrill Lynch & Co, Inc.,*
   694 F.3d 873 (7th Cir. 2012) ............................................................................ 19

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,*
   558 F.2d 1283 (7th Cir. 1977) ................................................................... 14, 18

*Miller v. Pac. Shore Funding,*
   224 F. Supp. 2d 977 (D. Md. 2002) ................................................................... 7

*Mirza v. Dep't of the Treas. ex rel. Rubin,*
   17 F. Supp. 2d 759 (N.D. Ill. 1998) ................................................................... 6

*Northfield Ins. Co. v. City of Waukegan,*
   701 F.3d 1124 (7th Cir. 2012) ............................................................................ 7

*Ohio Civil Rights Comm'n v. Wells Fargo Bank, N.A.,*
   No. 1:11-cv-623, 2012 U.S. Dist. LEXIS 52829 (N.D. Ohio Apr. 16, 2012) ........... 7

*Pandozy v. Segan,*
   340 F. App'x 723 (2d Cir. 2009) ..................................................................... 19

*People v. Wells Fargo & Co.,*
   No. 09-CH-2634 (Ill. Cir. Ct. Cook Cnty. filed July 31, 2009) .......................... 9

*Pers. Adm'r v. Feeney,*
   442 U.S. 256 (1979) ........................................................................................ 19

*Plotkin v. Ryan,*
   239 F.3d 882 (7th Cir. 2001) ............................................................................ 11

*Reid L. v. Ill. State Bd. of Educ.,*
   358 F.3d 511 (7th Cir. 2004) ............................................................................ 11

*Resnick v. AvMed, Inc.,*
   693 F.3d 1317 (11th Cir. 2012) ........................................................................ 17

*Rodriguez v. Nat'l City Bank,*
   726 F.3d 372 (3d Cir. 2013) ............................................................................. 19

*Rothstein v. UBS AG,*
   708 F.3d 82 (2d Cir. 2013) ............................................................................... 17

*Sakugawa v. IndyMac Bank, F.S.B.*,
No. 10-00504, 2010 U.S. Dist. LEXIS 125096 (D. Haw. Nov. 24, 2010) ............................... 7

*Savory v. Lyons*,
469 F.3d 667 (7th Cir. 2006) ...................................................................................................... 8

*Selan v. Kiley*,
969 F.2d 560 (7th Cir. 1992) ...................................................................................................... 6

*Shanoff v. Ill. Dep't of Human Servs.*,
258 F.3d 696 (7th Cir. 2001) ...................................................................................................... 8

*Smith v. City of Jackson*,
544 U.S. 228 (2005)............................................................................................................. 17, 18

*Soltys v. Costello*,
520 F.3d 737 (7th Cir. 2008) .................................................................................................... 10

*Soto v. City of W. Chicago*,
No. 10-c-3602, 2010 U.S. Dist. LEXIS 123195 (N.D. Ill. Nov. 19, 2010) ............................... 8

*Stepney v. Outsourcing Solutions, Inc.*,
No. 97 C 5288, 1997 U.S. Dist. LEXIS 18264 (N.D. Ill. Nov. 13, 1997)............................... 20

*Taylor v. Accredited Home Lenders, Inc.*,
580 F. Supp. 2d 1062 (S.D. Cal. 2008)...................................................................................... 7

*Thompson v. N. Am. Stainless, LP*,
131 S. Ct. 863 (2011)........................................................................................................... 15, 16

*Twp. of Mount Holly v. Mount Holly Gardens Citizens in Action, Inc.*,
133 S. Ct. 2824 (2013)............................................................................................................... 18

*Trafficante v. Metro. Life Ins. Co.*,
409 U.S. 205 (1972)...................................................................................................... 14, 15, 16

*United States v. Laraneta*,
700 F.3d 983 (7th Cir. 2012) .................................................................................................... 17

*United States v. Midwest Generation, LLC*,
720 F.3d 644 (7th Cir. 2013) ...................................................................................................6-7

*Wagner v. Magellan Health Servs.*,
125 F. Supp. 2d 302 (N.D. Ill. 2000) ....................................................................................... 13

*Wal–Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ................................................................................................. 18

*Wards Cove Packing Co. v. Antonio*,
  490 U.S. 642 (1989) ............................................................................................... 18, 19

*Warth v. Seldin*,
  422 U.S. 490 (1975) ....................................................................................................... 11

*White v. PNC Fin. Servs. Grp.*,
  No. 11-cv-7928, 2013 U.S. Dist. LEXIS 86650 (E.D. Pa. June 20, 2013) ................................ 9

*Wis. Right to Life, Inc. v. Schober*,
  366 F.3d 485 (7th Cir. 2004) ...................................................................................... 10-11

*Zamudio v. HSBC N. Am. Holdings Inc.*,
  No. 07 C 4315, 2008 U.S. Dist. LEXIS 13952 (N.D. Ill. Feb. 20, 2008) ................................ 18

**Statutes**

42 U.S.C. § 3601 .......................................................................................................... 14
42 U.S.C. § 3613(a)(1)(A) ................................................................................................ 5
ADEA § 4(a)(1), 29 U.S.C. § 623(a)(1) ......................................................................... 18
Fair Housing Act, 42 U.S.C. § 3605, *et seq* ............................................................. *passim*

**Rules**

Fed. R. Civ. P. 12 ........................................................................................................ 10, 19
Fed. R. Civ. P. 56 ............................................................................................................ 19

## INTRODUCTION

This lawsuit replicates attempts by other city and county governments over the years to attribute the fallout of the 2008 financial crisis to allegedly discriminatory subprime mortgage loan origination practices by a small handful of lenders. Prior cases have blamed other banks, but the Georgia plaintiffs' lawyers who filed this case and an identical case in Atlanta blame HSBC. Cook County theorizes that, between 2003 and 2007, HSBC originated unidentified subprime loans in violation of the Fair Housing Act, 42 U.S.C. § 3605, *et seq* ("FHA"), and that, through a zigzag causal chain, these loans became delinquent, which led to foreclosures and vacancies, which led to a decrease in property tax revenues and an increase in expenditures for government services. Although HSBC's Cook County market share ranged from only 1.0% to 2.6% during this period, the County blames it for generalized woes.

As a threshold matter, the County's claim is based on loans originated between 2003 and 2007. The County did not file its claim until March 21, 2014—more than six years after the last allegedly harmful loan was made. The claim is unquestionably barred by the FHA's two-year statute of limitations. The continuing violation doctrine does not save the claim because the County has not alleged a cognizable violation of the FHA within the limitations period. Moreover, the public record and the Amended Complaint ("Complaint" or "FAC") itself make clear that the County knew, or reasonably should have known, of the facts forming the basis for its claim well before March 21, 2012. Other iterations of the same lawsuit against other lenders have been filed at various times since 2008, and there is no reason why the County should be excused from having slept on its rights here. While the Complaint appears to allege that each monthly mortgage payment resets the statute of limitations, it is clear that the FHA does not provide a life-of-loan limitations period. The Complaint's allegations of poor servicing practices visited equally upon all borrowers also do not implicate the FHA.

1

In addition, even if the claim had been timely filed, the County lacks standing under Article III of the U.S. Constitution to bring it. The County alleges a long, speculative causal chain that neither leads to concrete and particularized harm nor can be fairly traced to any identified loan. The County also acknowledges the significant economic factors at issue in the financial crisis, and—although it blames only HSBC—alleges more than 20 times that "other industry participants" caused its injury. Courts have rejected substantially similar lawsuits by other municipalities for this reason, even before a recent Supreme Court case highlighted that municipalities should not achieve Article III standing for indirect damages under the FHA at the pleading stage without any showing that they fall within the scope of the statute. After *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), it is clear that statutory causes of action require that a plaintiff be within the zone of interest that Congress intended to protect and that the alleged injury be proximately caused by a violation of the statute. A diminution in Cook County's tax receipts resulting from a national financial crisis is not within the zone of interest underlying Congress' passage of the FHA. Moreover, the County does not allege—and, under its theory of liability, cannot allege—that its purported injury was proximately caused by a violation of the FHA, as it must under *Lexmark*.

In addition, the County has not stated a claim under either a disparate impact or disparate treatment theory because it identifies no discrete policy or practice either resulting in a disparate impact or motivated by racial animus. Instead, it alleges only a policy of discretion and a profit motive. Moreover, five of the named Defendants are not alleged to have originated mortgage loans or otherwise engaged in conduct covered by the FHA at all (and they did not), and the County has not alleged the relevant requirements for veil-piercing. For all of these reasons, the untimely and deficient claim should be dismissed with prejudice.

2

## RELEVANT BACKGROUND

The Complaint is predicated on allegations that Defendants originated discriminatory, subprime loans between 2003 and 2007. (FAC ¶¶ 8-9, 17, 22, 45, 57, 135, 142, 185, 190, 216-17, 221, 242, 255-56, 302.) The County theorizes that some unidentified number of them became delinquent and were foreclosed upon, and that resulting vacant properties decreased property tax revenues and increased expenditures for government services. (FAC ¶¶ 312-25.) The County knew, or reasonably should have known, of each fact forming the basis of its Complaint long before it was filed. This is clear from the bedrock factual allegations advanced in support of the claim, which rely on reports and articles publicly available between December 2004 and November 2011.[1] In particular, the County relies extensively on Home Mortgage Disclosure Act ("HMDA") data from 2003 to 2007, which is published annually and is publicly available. (FAC ¶¶ 47-58, 69, 105, 109, 134-37, 252.)

In resolutions passed on January 9, 2008 and September 17, 2008, the County specifically spelled out the facts forming the basis for its claim, as illustrated in the table below.

|  | Board of Commissioners Resolutions (Jan. 9 and Sept. 17, 2008) | Allegations in Complaint (Mar. 31, 2014) |
|---|---|---|
| **Increasing rate of foreclosure** | "[T]he foreclosure rate of homes in Cook County and across America is rapidly increasing." (Ex. A at 9.)[2]<br><br>"[I]n Cook County, foreclosures increased by 57% in May of 2008 as compared to 2007." (Ex. B at 2.) | Mortgage lending activity caused "unprecedented numbers of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies…." (FAC ¶ 3.) |

---

[1] Please see Appendix 1 for a table setting forth the dates and titles of source materials cited in support of the facts alleged, along with corresponding paragraphs in the Complaint.

[2] The Court may take judicial notice of the attached exhibits. *See, e.g., Deicher v. City of Evansville*, 545 F.3d 537, 541 (7th Cir. 2008); *Bardney v. United States*, 151 F.3d 1032, at *4 (7th Cir. 1998). Information subject to judicial notice may properly be considered on a motion to dismiss under Rule 12(b)(6). *See, e.g., Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 605 (7th Cir. 2013).

| | | |
|---|---|---|
| **Effects of foreclosure** | The "negative effects of foreclosure include the decline in property values, loss of home equity for both a foreclosed homeowner and neighboring homeowners; an increase in crime [and] vandalism…." (Ex. B at 2.) | The County was harmed through "reduced property values on foreclosed properties and surrounding properties." (FAC ¶ 285.)<br><br>Vacant properties become "vulnerable to vandalism and/or criminal activity." (FAC ¶ 266.)<br><br>Foreclosure and pre-foreclosure properties "have been vandalized and/or have provided a location for illegal activities." (FAC ¶ 291.) |
| **Relation to subprime lending** | "[T]he foreclosure rate for the United States has hit the highest rate since 1986 in the Third Quarter [of 2007], and subprime loans are the highest group of loans in foreclosure with 4.72% of the subprime loans in foreclosure[.]" (Ex. A at 9.) | "[S]ubprime loans are more than 5 times more likely to be seriously delinquent or in foreclosure than prime loans." (FAC ¶ 9.) |
| **Involvement of mortgage lenders** | "[T]he financial community, specifically mortgage lenders, predatory and otherwise, who have contributed to the mortgage and foreclosure crisis, must also do their part…" (Ex. B at 3.) | "The foreclosure crisis was the foreseeable and inevitable result of" the mortgage origination industry. (FAC ¶ 4.) |

While the resolutions did not address discrimination, the County was aware of this allegation as well. The State of Illinois filed a lawsuit *in Cook County Circuit Court* in July 2009, alleging that disparities in lending data showed that minority borrowers had been steered into discriminatory subprime mortgage loans, "drain[ing] wealth from families and neighborhoods and add[ing] to the stockpile of boarded-up homes that are an open invitation to criminals." *See* Ex. C, Press Release, Illinois Attorney General Lisa Madigan, Madigan Sues Wells Fargo for Discriminatory and Deceptive Mortgage Lending Practices (July 31, 2009) at 3. The City of Chicago was a party to an agreement entitled "Common Interest in Anticipation of Litigation Joint Participation Agreement for Cities and Municipalities," which "enable[d] members to share research and legal documents, as well as to update one another and to jointly strategize concerning these efforts." *See* Ex. D, Report on the Progress of the Multi-City Litigation Work Group on Foreclosures (Apr. 14, 2009) at 2-3.

The Complaint also recognizes the complexity of factors actually to blame for the County's problems. For example, it alleges that declining economic conditions "led to higher

4

unemployment and therefore more mortgage loan delinquencies, defaults, foreclosures and vacancies" (FAC ¶ 240; *see also* FAC ¶¶ 19, 231), and that HSBC's alleged misconduct only "exacerbated the spiraling level of mortgage loan defaults, foreclosures and home vacancies as home prices fell from increased foreclosures and the deteriorating economy." (FAC ¶ 25; *see also* FAC ¶¶ 113, 119, 127.) In addition, the County lost over 89,000 manufacturing jobs beginning in 2000, leading to a "lost decade" of economic decline. *See* Ex. E, Thomas Hargrove, *The Lost Decade: Cook County Loses 26% of Manufacturing Jobs*, CHI. SUN-TIMES, Nov. 25, 2011. Cook County later stated that resulting "high unemployment" and "lower household incomes" caused reduced homeownership. *See* Ex. F, Cook County, 5 Year Strategic Plan (2010-2015) at 31.

## ARGUMENT

### I. THE COUNTY'S CLAIM IS UNTIMELY.

#### A. The County's Claim Is Time-Barred By The Two-Year Statute of Limitations.

Under the FHA, "[a]n aggrieved person may commence a civil action . . . not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). The statute of limitations begins to run on the date a borrower obtains an allegedly discriminatory loan. *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 532 (7th Cir. 2011). The County filed this action on March 21, 2014, advancing a single claim under the FHA. Thus, its claim must be based on mortgage loans that were originated on or after March 21, 2012. *Id.* at 539 ("Like the district court before us, we limit our review of [plaintiff's] claim to those events that occurred within the two-year statute of limitations for FHA claims[.]") *See also Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 290-92 (S.D.N.Y. 2011) (dismissing with prejudice untimely FHA claim where loan closed more than two years prior to filing) (citing

authority).  The County's claim, however, is based on allegations of discriminatory lending that

occurred between 2003 and 2007, well outside the two-year statute of limitations period.  (FAC

¶¶ 8-9, 17, 22, 45, 57, 135, 142, 185, 190, 216-17, 221, 242, 255-56, 302.)

**B.      The Continuing Violation Doctrine Does Not Apply.**

The County asserts that the statute of limitations has not yet begun to run because

Defendants continue to service allegedly discriminatory loans.  (FAC ¶¶ 259-281.)  As this Court

recently explained, however, the continuing violation doctrine "allows a 'suit to be delayed until

a series of wrongful acts blossoms into an injury on which suit can be brought. . . . It is thus a

doctrine not about a continuing, but about a cumulative, violation.'"  *La Playita Cicero, Inc. v.*

*Town of Cicero,* No. 11-cv-1702, 2014 U.S. Dist. LEXIS 31070, at *28 (N.D. Ill. Mar. 11, 2014)

(Lee, J.) (quoting  *Limestone Dev. Corp. v. Vill. of Lemont, Ill*., 520 F.3d 797, 801 (7th Cir.

2008)).[3]  The Complaint alleges a series of wrongful acts that blossomed into an injury more

than six years ago, well before the March 21, 2012 limitations period.

**1.      The Complaint Alleges No Discriminatory Act Within The Past Two Years.**

The County's claim is based on mortgage loans originated between 2003 and 2007.[4]  For

the continuing violation doctrine to apply, the County must allege a violation of the FHA "that

occurred within the statutory period."  *See EEOC v. N. Gibson Sch. Corp*., 266 F.3d 607, 617

(7th Cir. 2001); *see also Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992).  A continuing effect

of prior unlawful conduct is not a continuing violation.  *United States v. Midwest Generation*,

---

[3] It is the County's burden to establish that the continuing violation doctrine applies.  *Mirza v. Dep't of the Treas. ex rel. Rubin*, 17 F. Supp. 2d 759, 774 (N.D. Ill. 1998) (citing *Knox v. Cook Cnty. Sheriff's Police Dep't*, 866 F.2d 905, 907 (7th Cir. 1988)).

[4] *See* FAC ¶¶ 8-9, 17, 22, 45, 57, 135, 142, 185, 190, 216-17, 221, 242, 255-56, 302.  The County asserts that "Defendants' subprime mortgage origination practices at issue subsided substantially after the Financial Crisis [but] still continue to a lesser degree."  (FAC ¶ 259.)  However, the County's factual allegations regarding Defendants' mortgage origination practices are limited to the time period between 2003 and 2007, and the County does not plead that Defendants have originated any subprime mortgage loans in violation of the FHA within the limitations period.

6

*LLC*, 720 F.3d 644, 648 (7th Cir. 2013) ("[E]nduring consequences of acts that precede the statute of limitations are not independently wrongful"); *Northfield Ins. Co. v. City of Waukegan*, 701 F.3d 1124, 1133 (7th Cir. 2012) (noting conflation of "continuing harmful acts with the continuing effects of one harmful act").

The County asserts that the continuing violation doctrine is invoked by "the receipt and processing of each mortgage payment by each minority borrower who received a mortgage loan at issue." (FAC ¶ 281.) However, "[i]n discriminatory lending claims, the conduct giving rise to the discrimination claim is the issuance of the unfavorable, discriminatory loan and payments made on the loan do not constitute separate violations." *Ohio Civil Rights Comm'n v. Wells Fargo Bank, N.A.*, No. 1:11-cv-623, 2012 U.S. Dist. LEXIS 52829, at *13 (N.D. Ohio Apr. 16, 2012). Mortgage payments do not reset the clock on the statute of limitations.[5]

Further, the County's allegations relating to servicing do not allege that any of the alleged ministerial deficiencies resulted in unfavorable treatment or outcomes for minority borrowers.[6]

---

[5] *See also Hernandez v. Sutter W. Capital*, No. C 09-03658 CRB, 2010 U.S. Dist. LEXIS 88109, at *9-10 (N.D. Ca. Aug. 26 2010) ("the payments Plaintiff made pursuant to the loans were effects of any violation, not new violations in their own right"); *Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 2d 862, 875 (N.D. Cal. 2010) (a claim that "hones in on the origination and consummation of" a loan does not provide a basis for a "continuing violation"); *Sakugawa v. IndyMac Bank, F.S.B.*, No. 10-00504, 2010 U.S. Dist. LEXIS 125096, at *13 (D. Haw. Nov. 24, 2010) (where a claim is "based on the issuance of the mortgage loan, the continuing violation doctrine does not apply"); *King v. Ameriquest Mortg. Co.*, No. PJM 09-977, 2009 U.S. Dist LEXIS 102270, at *9 (D. Md. Oct. 30, 2009) ("the payment of his mortgage each month does not result in continuous fraud"); *Cervantes v. Countrywide Home Loans, Inc.*, No. CV 09-517-PHXJAT, 2009 U.S. Dist. LEXIS 87997, at *21 (D. Az. Sept. 24, 2009) ("issuing of the loans were one-time acts; [a] continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation"); *Lyons v. First Am. Title Ins. Co.*, No. C 09-4156 PJH, 2009 U.S. Dist. LEXIS 119859, at *13 (N.D. Cal. Dec. 22, 2009) ("The fact that plaintiffs continue to pay premiums . . . constitutes only a continuing effect"); *Miller v. Pac. Shore Funding*, 224 F. Supp. 2d 977, 990 (D. Md. 2002) (repeated payments "are no more than the lingering, ongoing, continuing aspects" of time-barred action). *But see Taylor v. Accredited Home Lenders, Inc.*, 580 F. Supp. 2d 1062, 1066 (S.D. Cal. 2008) (applying continuing violation based on mortgage payments).

[6] *See* FAC ¶ 269 (alleging failure to maintain adequate "financial, staffing, and managerial resources," to increase "management and staffing levels to ensure timely, effective, and efficient communication with borrowers," to have in place adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and board oversight of the foreclosure process, filing robo-signed

*See Farrar v. Eldibany*, 137 F. App'x 910, 912 (7th Cir. 2005) (affirming dismissal of FHA claim where alleged conduct affected all tenants regardless of race); *Brandt v. Vill. of Chebanse*, 82 F.3d 172, 175 (7th Cir. 1996) (acknowledging that FHA does not prohibit conduct that affects all persons equally); *Edwards v. Lake Terrace Condo. Ass'n*, No. 1:10-cv-2986, 2011 U.S. Dist. LEXIS 43304, at *13 (N.D. Ill. Apr. 21, 2011) (dismissing FHA claim where challenged policy applied equally).[7]

**2. The County Was Aware Of Its Claim More Than Two Years Before Filing.**

The continuing violation doctrine also does not apply because the County was or, through the exercise of reasonable diligence, should have been aware of the basis of its claim well before March 21, 2012. *See Savory v. Lyons*, 469 F.3d 667, 673 (7th Cir. 2006) (refusing to apply continuing violation doctrine where plaintiff knew of the facts forming the basis of his claim before the limitations period). As this Court recently explained, if "Plaintiff[] knew or should have known that [it] had [a] claim based upon the events that took place prior to" the limitations period, "the continuing violation doctrine does not apply." *La Playita Cicero*, 2014 U.S. Dist. LEXIS 31070, at *29-30.[8] Allegations throughout the Complaint are based on articles, reports,

---

affidavits in bankruptcy proceedings, filing affidavits not properly notarized in state and bankruptcy courts, and litigating foreclosure and bankruptcy proceedings without orderly mortgage loan documentation).

[7] If the County were to have alleged any discriminatory servicing conduct within the limitations period—and it did not—such *servicing* activity would constitute discrete acts by Defendants separate and apart from the allegedly discriminatory *origination* activity that occurred between 2003 and 2007, and not a continuing violation. *See Estate of Davis*, 633 F.3d at 539 (limiting review of FHA claim alleging discrimination in administration of individual borrower's mortgage "to those events that occurred within the two-year statute of limitations for FHA claims").

[8] *See also Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 703 (7th Cir. 2001) (where the "conduct that occurred before the limitations period was sufficient to notify the plaintiff that he had a substantial claim . . . the continuing violation doctrine does not apply[.]"); *Soto v. City of W. Chicago*, No. 10-c-3602, 2010 U.S. Dist. LEXIS 123195, at *17 (N.D. Ill. Nov. 19, 2010) (dismissing FHA claim as untimely and holding that continuing violation doctrine does not apply because plaintiff "knew or had reason to know of his alleged injuries much earlier than the date he filed his complaint.").

and Congressional statements published between 2004 and 2011.[9] (FAC ¶¶ 8-9, 50, 52, 56, 200, 212, 232-234, 237, 239, 242, 244-48, 287-89, 302; *see also* Appendix 1.) The County, however, does not allege the date it discovered its claim or a single fact occurring on or after March 21, 2012 that put it on notice of a previously undiscoverable claim. *See White v. PNC Fin. Servs. Grp.*, No. 11-cv-7928, 2013 U.S. Dist. LEXIS 86650, at *24 (E.D. Pa. June 20, 2013) ("Plaintiffs do not plead a tolling date, and the amended complaint contains no indication as to when, and under what circumstances, Plaintiffs discovered the critical facts underlying" their claims.)[10]

In addition, the cities of Baltimore, Birmingham, and Memphis all filed virtually identical claims many years prior to the limitations period here.[11] The State of Illinois did so too—in Cook County Circuit Court—alleging state-law violations in connection with minority borrowers alleged to have been "steered" into subprime loans. *See People v. Wells Fargo & Co.*, No. 09-CH-2634 (Ill. Cir. Ct. Cook Cnty. filed July 31, 2009). The wrongful lending practices alleged by the County did not suddenly blossom two years ago into an actionable claim. The County slept on its rights.

---

[9] For example, Plaintiff relies on a report issued in 2011, which recites verbatim the theory of liability in the Complaint: that minority borrowers were more likely to receive subprime loans, resulting in higher foreclosure rates in minority communities, which has impacted communities by causing a decrease in tax revenue, an increase in servicing costs, and higher rates of crime. (FAC ¶ 248 (citing Debbie Gruenstein Bocian et al., Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures (November 2011).) In addition, Plaintiff relies on publicly available HMDA data, which is published annually, to support its allegations of discriminatory lending by Defendants between 2003 and 2007. (FAC ¶¶ 49-58, 109, 134-37.)

[10] While the County makes allegations regarding the difficulty of determining the mortgagees of specific properties, this difficulty allegedly remains and thus does not explain the years of delay. (FAC ¶¶ 195-204.)

[11] *See Mayor of Baltimore v. Wells Fargo Bank, N.A.*, 677 F. Supp. 2d 847 (2010); *City of Birmingham v. Citigroup, Inc.*, No. CV-09-BE-467-S, 2009 U.S. Dist. LEXIS 123123 (N.D. Ala. Aug. 19, 2009); *City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-02857-STA, 2011 U.S. Dist. LEXIS 48522 (W.D. Tenn. May 4, 2011). The City of Cleveland also brought similar claims in 2008 under a public nuisance theory, alleging that subprime lending and foreclosures, traceable to securitized mortgage loans, were responsible for the City's diminished tax revenues and out-of-pocket costs. *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 621 F. Supp. 2d 513 (2009).

### C.     The Complaint Should Be Dismissed With Prejudice.

A court may dismiss a complaint with prejudice where, as here, the statute of limitations renders amendment futile.  *See*, *e.g.*, *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008); *Kamelgard v. Macura*, 585 F.3d 334, 344 (7th Cir. 2009) (modifying judgment to dismiss time-barred lawsuit with prejudice); *Evans v. Vocamotive, Inc.*, No. 11-c-8197, 2012 U.S. Dist. LEXIS 133599, at *2 (N.D. Ill. Sept. 18, 2012) (dismissing time-barred claim with prejudice).

## II.     THE COUNTY DOES NOT HAVE STANDING.

The County does not have standing to sue.  As an initial matter, the County has not pled an injury sufficient to satisfy the Constitution's Article III case or controversy requirement.  As a result, this court lacks subject matter jurisdiction over the claim and it should be dismissed.  Fed. R. Civ. P. 12(b)(1); *Johnson v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 719 F.3d 601, 606 (7th Cir. 2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).[12]  Moreover, the County does not meet requirements for statutory standing, which the Supreme Court radically clarified just over two months ago in *Lexmark*, requiring both that a plaintiff fall within the zone of interest Congress intended to protect and that the alleged injury be proximately caused by a violation of the statute.

### A.     The County Does Not Have Standing Under Article III.

In order to establish Article III standing, a plaintiff must plead:  "'(i) an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical; (ii) a causal relation between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged action of the defendant; and (iii) a likelihood that the injury will be redressed by a favorable decision.'"  *Wis.*

---

[12] Plaintiff bears and has not met the burden of establishing that it has standing.  *Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 488 (7th Cir. 2004).

*Right to Life, Inc.*, 366 F.3d at 488 (quoting *Reid L. v. Ill. State Bd. of Educ.*, 358 F.3d 511, 515 (7th Cir. 2004)). *See also Lujan*, 504 U.S. at 560-61; *Allen v. Wright*, 468 U.S. 737, 751 (1984).

The injury Plaintiff alleges here is a general decrease in tax revenue and increase in the costs of government services associated with vacant properties. (FAC ¶ 285.) The County does not point to a single property through which these injuries are alleged to flow from HSBC's alleged unlawful lending practices. Instead, Plaintiff alleges a County-wide decrease in its tax digest (FAC ¶ 298) and a general increase in "out-of pocket costs." (FAC ¶ 310.) Such generalized allegations are not sufficiently concrete or particularized to satisfy Article III's standing requirement. *See Warth v. Seldin*, 422 U.S. 490, 508 (1975) (requiring plaintiff to plead "specific, concrete facts demonstrating that the challenged practices harm him"); *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 601 (2007) (generalized grievances do not satisfy Article III); *Plotkin v. Ryan*, 239 F.3d 882, 884 (7th Cir. 2001) (same).

In a virtually identical case brought by the City of Birmingham, the court dismissed the city's claims for lack of standing, explaining that "a series of speculative inferences must be drawn to connect the injuries asserted with the alleged wrongful conduct by the Defendants," and that borrowers "could have defaulted on their mortgage for a number of reasons, none of which related to the Defendants' alleged 'reverse redlining.'" *City of Birmingham*, 2009 U.S. Dist. LEXIS 123123, at *12. The court further explained that "it is quite speculative that the depreciation in value of the neighboring homes in the City was caused by the foreclosures of minority borrowers' properties rather than as a result of 'a myriad of other factors'" including "rising unemployment in the region, changes in the housing market, or other economic conditions." *Id.* at *12-13 (citations omitted). The court concluded that "[t]he loss of tax

11

revenue from property taxes and the increase in spending, like the depreciation in home values, could have been caused by any number of factors having nothing to do with the Defendants' alleged 'reverse redlining.'" *Id.* at *13.

Similarly, the City of Baltimore's case was dismissed twice as the court observed that "when considered against the background of other factors leading to the deterioration of the inner city, such as extensive unemployment, lack of educational opportunity and choice, irresponsible parenting, disrespect for the law, wide-spread drug use, and violence," the city's alleged injury was not fairly traceable to defendants' conduct. *Baltimore*, 677 F. Supp. at 850. It was allowed to proceed only after plaintiffs amended their complaint to include specific properties that allegedly would not have been vacant but for alleged discriminatory lending practices.[13]

The County similarly has failed to adequately plead that any of its alleged injuries are fairly traceable to Defendants. *See Lujan*, 504 U.S. at 560 (the alleged injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court") (internal citations omitted); *Allen*, 468 U.S. at 756 ("The line of causation between the [alleged] illegal conduct and injury" must not be "too attenuated."). To the contrary, the Complaint is replete with acknowledgements of the multitude

---

[13] *See also City of Memphis*, 2011 U.S. Dist. LEXIS 48522, at *30 (noting that plaintiffs identified specific properties "where allegedly predatory [] loans actually resulted in foreclosures and vacancies"); *City of Cleveland*, 621 F. Supp. 2d at 533-34 (finding that "[i]t would be tremendously difficult, if not completely impossible, to determine which of the City's damages are attributable to Defendants' alleged misconduct and not to some absent party," recognizing that "the borrower may have lost a job . . . suffered a catastrophic injury, borrowed too much on credit cards . . . suffered investment losses that depleted savings . . . or, despite an ability to pay, simply decided to walk away from the mortgage); *DeKalb Cnty. v. HSBC N. Am. Holdings*, No. 1:12-cv-03640-SCJ, 2013 U.S. Dist. LEXIS 185976, at *31 (N.D. Ga. Sept. 24, 2013) (allowing claims to proceed but bifurcating discovery to resolve first whether complaint was barred by the FHA's statute of limitations, and ordering plaintiffs to amend their complaint after discovery to identify the specific "properties that they allege were affected by discriminatory loans and from which they suffered injury"); Order Denying Defendants' Motion to Dismiss at 2, 9, *City of Los Angeles v. Wells Fargo & Co.*, No. 2:13-cv-9007-ODW(RZx) (C.D. Ca. May 28, 2014), ECF No. 37 (observing that Plaintiff identified, through publicly available data, 1,447 specific properties alleged to have harmed Plaintiff).

12

of complex social and economic forces that are the real causes of its alleged injury.  For example, the County alleges that HSBC's alleged actions have only "exacerbated the spiraling level of mortgage loan defaults, foreclosures and home vacancies as home prices fall from increased foreclosures and the deteriorating economy."  (FAC ¶ 25; *see also* FAC ¶¶ 113, 119, 127.)  The County also alleges that declining economic conditions "led to higher unemployment and therefore more mortgage loan delinquencies, defaults, foreclosures and vacancies."  (FAC ¶ 240; *see also* FAC ¶¶ 19, 231.)

Though the County blames HSBC alone, it alleges more than 20 times that the conduct of "other industry participants" caused the foreclosure crisis and the various other harms alleged.  (*See* FAC ¶¶ 4, 11, 19, 176, 178, 179, 180, 196, 200, 213, 223, 231, 237, 249, 267, 250, 282, 298.)  The County also ignores divorce, job loss, illness, personal tragedies, and many of the other factors that precipitate foreclosures, as well as macroeconomic forces, including Cook County's "lost decade" of decline.  Consequently, the County has not pled an injury fairly traceable to HSBC.  *See Johnson*, 719 F.3d 601, 607 (7th Cir. 2013) (injury was "the result of the independent action of some third party not before the court.") (citing *Lujan*, 504 U.S. at 560).[14]

### B.  The County Does Not Have Statutory Standing Under *Lexmark*.

Even if the County had Article III standing—and it does not—the County's claim fails for the independent reason that it has not satisfied the more stringent requirements for bringing a

---

[14] The County pleads that it is "virtually impossible" to determine which industry participants hold which mortgages in Cook County and that "the only way to precisely determine the properties possessed by, or in control of, Defendants and other industry participants, will be through discovery of Defendants and MERS[.]"  (FAC ¶¶ 201-202.)  It is not permissible, however, for a plaintiff to file a complaint against a random industry participant in order to conduct a fishing expedition of Defendants and other unnamed industry participants.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Wagner v. Magellan Health Servs.*, 125 F. Supp. 2d 302, 307 (N.D. Ill. 2000) ("This is the quintessence of a fishing expedition, and cannot defeat a motion to dismiss.").  To the contrary, a plaintiff must allege a concrete, particularized injury that is fairly traceable to the defendants named in the action.  *See Lujan*, 504 U.S. at 560.  The County here fails to meet that standard.

statutory cause of action. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). Prior to *Lexmark,* courts held that factors traditionally considered part of prudential standing do not apply to FHA claims because standing under the FHA extends to the limits allowed by Article III. *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982) (citing *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 96-97 (1979)). In *Lexmark*, however, the Supreme Court held that, in addition to Article III standing requirements, a plaintiff bringing a statutory cause of action must plead that its injury (i) is within the "zone of interest" that the statute was designed to protect, and (ii) was proximately caused by a violation of the statute. *Lexmark*, 134 S. Ct. at 1388.

The County's alleged injuries do not fall within the zone of interest the FHA was enacted to protect. As the Supreme Court explained in *Lexmark*, "the breadth of the zone of interests varies according to the provisions of the law at issue." *Id.* The FHA's stated policy is "to provide, within constitutional limitations, for fair housing throughout the United States," 42 U.S.C. § 3601, and the purpose of this policy is to promote integrated residential housing patterns. *See, e.g.*, *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1289 (7th Cir. 1977) (the purpose of the FHA is to "promote open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups[.]") (internal citations omitted); *Jorman v. Veterans Admin.*, 500 F. Supp. 460, 464 (N.D. Ill. 1980) ("The purpose of the Fair Housing Act is to provide 'fair housing throughout the United States,' by bringing about 'truly integrated and balanced living patterns.'") (quoting 42 U.S.C. § 3601 and *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972)).

Consistent with the FHA's stated policy, the Supreme Court has found standing—beyond persons actually alleged to have been victims of discrimination—only where a plaintiff alleged

14

denial of the benefit of integrated housing. The Supreme Court first addressed FHA standing in

*Trafficante*, holding that tenants of a housing complex charged with discrimination had FHA

standing because the alleged injury was "the loss of important benefits from interracial

associations" including "the social benefits of living in an integrated community[.]" 409 U.S. at

210. Subsequently, in *Gladstone*, the Supreme Court held that plaintiffs had standing to bring an

FHA claim for racial steering where the alleged injuries were related to the community "losing

its integrated character." 41 U.S. at 113. Then, in *Havens Realty*, a case that also involved racial

steering, the Court held that individual plaintiffs may have standing where the alleged injury was

the loss of "benefits that result from living in an integrated community," and that an

organizational plaintiff had standing where the alleged injury resulted from its "interest in

encouraging open housing[.]" 455 U.S. at 375, 379 n.20.

    In a case particularly instructive here, the Supreme Court recently addressed standing to

bring a claim under Title VII, which provides a cause of action for a "person aggrieved" by a

violation of the statute. *Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 870 (2011). The

Court held that "the term 'aggrieved' must be construed more narrowly than the outer boundaries

of Article III," and explicitly abandoned its prior statements in *Trafficante* (which had been

applied to Title VII cases) that standing for aggrieved persons is as broad as permitted by Article

III. *Id.* at 869-70. Instead, to determine the appropriate limits on standing, the Court stated that

a "person aggrieved" is a person who "falls within the 'zone of interests' sought to be protected

by the statutory provision whose violation forms the legal basis for his complaint." *Id.* at 870.

The Court explained that application of the zone of interest "exclude[s] plaintiffs who might

technically be injured in an Article III sense but whose interests are unrelated to the statutory

prohibitions." *Id.* The Court further explained that the zone of interest does not encompass

15

"collateral damage" and observed that "[i]f any person injured in the Article III sense by a Title VII violation could sue, absurd consequences would follow. For example, a shareholder would be able to sue a company for firing a valuable employee for racially discriminatory reasons, so long as he could show that the value of his stock decreased as a consequence." *Id.* at 869. This same reasoning applies to cases brought under the FHA. Indeed, both Title VII and Title VIII (the FHA) provide causes of action to "aggrieved persons," and the Court has consistently looked to decisions interpreting one statute when interpreting the other. *See, e.g.*, *Trafficante*, 409 U.S. 205; *Thompson*, 131 S. Ct. 863. And the Court's holding in *Lexmark* leaves no doubt that the zone of interest applies to all statutory causes of action, including the FHA.

In view of the entirety of this Supreme Court authority—including (i) strict application of the zone of interest to statutory causes of action under *Lexmark*; (ii) prior rulings regarding FHA standing in *Trafficante*, *Gladstone*, and *Havens Realty*; and (iii) limitations on standing for "persons aggrieved" in *Thompson*—it is clear that the FHA's zone of interest includes persons discriminated against and those denied the benefit of integrated housing. The County does not purport to have been discriminated against, and it does not allege segregation in housing patterns. Decreased tax revenues and increased costs of government services are, at best, the sort of "collateral damage" the Court specifically has found to be inadequate to confer statutory standing. *Thompson*, 131 S. Ct. at 870; *see also DT Apt. Grp., LP v. CWCapital, LLC*, No. 3:12-CV-0437-D, 2012 U.S. Dist. LEXIS 181741, at *53-54 (N.D. Tex. Dec. 26, 2012) (plaintiffs' claims were "outside the zone of interest" of the FHA because there was no allegation that plaintiffs "suffer[ed] from a lack of interracial association" as a result of the allegedly discriminatory conduct, but instead were "merely using an alleged discriminatory impact on minority tenants as the basis for complaining about defendants' business practice").

16

The County also has not pled that its alleged injuries were proximately caused by a violation of the FHA, which is a higher standard than the "fairly traceable" requirement in Article III. *See Lexmark*, 134 S. Ct. at 1391 n.6 ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct.").[15] Proximate causation requires that a plaintiff allege that it would not have been injured "but for" a violation of the statute—"a natural and continuous sequence, unbroken by any efficient intervening cause." *United States v. Laraneta*, 700 F.3d 983, 990 (7th Cir. 2012). And it "bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Lexmark,* 134 S. Ct. at 1390. The County here pleads that it is "virtually impossible" to identify injury-causing properties (FAC ¶ 201), which only highlights the remoteness of its claim. And even if the County could identify specific properties alleged to be at issue, there are simply too many independent, intervening factors—from individual circumstances like divorce, job loss, and illness, to the financial crisis and Cook County's "lost decade" of economic decline—each of which punches a hole in proximate causation.

## III.    THE COUNTY HAS NOT STATED A CLAIM FOR RELIEF.

### A.    The Fair Housing Act Does Not Recognize Disparate Impact Claims.

The County's Complaint is based on a "disparate impact" theory of FHA liability, under which a facially neutral practice has an allegedly disparate impact on minorities. (*See* FAC ¶¶ 15, 25, 109, 182, 244-58, 302, 315, 317.) Disparate impact claims, however, are not permitted under the FHA. In *Smith v. City of Jackson*, 544 U.S. 228 (2005), the Supreme Court stated that disparate impact requires that "the text focus[] on the *effects* of the action ... rather than the motivation for the action." *Id*. at 236 (emphasis in original). Applying that rule, the Court found

---

[15] *See also Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) ("the 'fairly traceable' standard is lower than that of proximate cause"); *Resnick v. AvMed, Inc*., 693 F.3d 1317, 1324  (11th Cir. 2012) ("A showing that an injury is 'fairly traceable' requires less than a showing of 'proximate cause.'").

that disparate impact is not cognizable under one section of the Age Discrimination in Employment Act ("ADEA"). *Id*. at 236-38 & n.6. Like that section of the ADEA, the FHA does not focus on effects rather than motivation. *Compare* ADEA § 4(a)(1), 29 U.S.C. § 623(a)(1), *with* FHA § 805(a), 42 U.S.C. § 3605(a). "[W]hen Congress uses the same language in two statutes having similar purposes ... it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *City of Jackson*, 544 U.S. at 233-34.[16]

### B.    The County Has Not Pled A Disparate Impact Claim.

The County's disparate impact claim also fails because the County has not alleged that Defendants engaged in a discrete practice that resulted in a disparate impact on minority borrowers. *See Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 656 (1989) (requiring identification of specific practice, not just racial disparity). While the County alleges a non-descript "discretionary pricing policy," courts have roundly rejected such theories after the Supreme Court's holding in *Wal–Mart Stores, Inc. v. Dukes* that merely allowing discretion is "a very common and presumptively reasonable way of doing business—one that we have said should itself raise no inference of discriminatory conduct." 131 S. Ct. 2541, 2555-56 (2011) (internal quotation omitted). As here, "[o]ther than the bare existence of delegated discretion, respondents have identified no 'specific [] practice'. . . ." *Id.* As the Third Circuit recently held in applying *Dukes* to similar allegations of discretionary pricing, "the exercise of broad discretion by an untold number of unique decision-makers in the making of thousands upon

---

[16] The Supreme Court had agreed to consider the issue of whether the FHA permits disparate impact claims in *Magner v. Gallagher*, 132 S. Ct. 548 (2011) and *Twp. of Mount Holly v. Mount Holly Gardens Citizens in Action, Inc.*, 133 S. Ct. 2824 (2013). Each case subsequently was dismissed by the parties. Although the Seventh Circuit has held that the FHA permits disparate impact claims, it has never addressed the impact of *City of Jackson* on that holding. *See, e.g.*, *Metro. Hous. Dev. Corp.*, 558 F.2d 1283. Post-*City of Jackson* district court decisions have not applied the Supreme Court's analysis to the FHA. *See, e.g.*, *Zamudio v. HSBC N. Am. Holdings Inc.*, No. 07 C 4315, 2008 U.S. Dist. LEXIS 13952, at *2 (N.D. Ill. Feb. 20, 2008); *Hoffman v. Option One Mortg. Corp.*, 589 F. Supp. 2d 1009, 1010-1011 (N.D. Ill. 2008).

thousands of individual decisions undermines the attempt to claim, on the basis of statistics alone, that the decisions are bound together by a common discriminatory mode." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 386 (3d Cir. 2013).[17]

### C. The County Has Not Pled A Disparate Treatment Claim.

The County also has failed to plead a disparate treatment claim because it has not alleged a policy or "course of action" undertaken "because of" and "not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979). *See also EEOC v. Chi. Miniature Lamp Works*, 947 F.2d 292, 299 (7th Cir. 1991); *McReynolds*, 694 F.3d at 886 (rejecting bare allegations that "Defendants intended to retain and more generously compensate white men"). To the contrary, the County alleges that HSBC's objective was to "maximize profits."[18]

## IV. NON-ORIGINATING ENTITIES SHOULD BE DISMISSED.

HSBC USA Inc., HSBC Finance Corporation, HSBC North America Holdings Inc., HFC Company LLC, and Beneficial LLC should be dismissed because they are not alleged to have originated mortgage loans, nor did they.[19] (*See* FAC ¶¶ 31, 32, 37; Phyllis I. Johnston Decl., Ex. G.) *See, e.g.*, *Pandozy v. Segan*, 340 F. App'x 723, 725 (2d Cir. 2009) (upholding dismissal of FHA claim in part because plaintiff did not allege that defendants "engaged in 'residential real-estate related transactions'"); *Hafiz v. Greenpoint Mortg. Funding, Inc.*, 652 F. Supp. 2d 1039,

---

[17] The County does not allege that *similarly situated* borrowers received dissimilar treatment. Absent such allegations, the County's claims cannot survive dismissal. *See McReynolds v. Merrill Lynch & Co, Inc.*, 694 F.3d 873, 886 (7th Cir. 2012) (noting that merely saying the words does not allow a complaint to survive a motion to dismiss); *Wards Cove*, 490 U.S. at 651-53 (finding no *prima facie* case in disparity absent statistical comparison of qualified and similarly-situated applicants).

[18] *See, e.g.*, FAC ¶ 115 ("Defendants' underwriting policies were designed to . . . maximize the amount of Defendants' revenues"); ¶ 322 (the goal of Defendants' alleged "broad scheme" was "to maximize profits").

[19] These entities should be dismissed under Rule 12(b)(6) because the County has not alleged that they originated mortgage loans. The Court may also consider the Declaration of Phyllis I. Johnston, Ex. G., which confirms that these entities did not originate mortgage loans, and dismiss the entities under Rule 56. *See* Fed. R. Civ. P. 12(d).

1045 (N.D. Cal. 2009) (dismissing FHA claim without allegation as to how defendant could have "engaged in discriminatory credit practices if they did not perform the services of a lender").

Plaintiff alleges only that they are corporate parents to other HSBC entities. *Id.* "As a general rule, a parent company and its subsidiary are 'two separate entities and the acts of one cannot be attributed to the other.'" *Jones v. Countrywide Home Loans, Inc.*, No. 09 C 4313, 2010 U.S. Dist. LEXIS 11846, at *9 (N.D. Ill. Feb. 11, 2010) (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000)).[20] Where, as here, jurisdiction is premised on a federal question, "federal common law of veil piercing liability" applies.[21] *Stepney v. Outsourcing Solutions, Inc.*, No. 97 C 5288, 1997 U.S. Dist. LEXIS 18264, at *8-9 (N.D. Ill. Nov. 13, 1997). Veil piercing requires "'such unity of interest and ownership'" that "'separate personalities of the corporation and the individual [or entity] no longer exist,'" and that "'adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.'" *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009). The County alleges none of the relevant factors for veil piercing, which include "inadequate capitalization, absence of independent activity, action in the interest of the parent rather than the subsidiary, and failure to observe the legal requirements of separate corporate existence." *Stepney*, 1997 U.S. Dist. LEXIS 18264, at *9. For this independent reason, these five entities should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that Plaintiff's Amended Complaint be dismissed in its entirety with prejudice.

---

[20] "A plaintiff who seeks to 'pierce the veil between a parent and a subsidiary' must show that one corporation is merely 'a dummy or sham for another.'" *Jones*, U.S. Dist. LEXIS 11846, at *9 (quoting *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002)).

[21] The federal test and the test under Illinois corporate law are essentially the same. *See Del Amora v. Metro Ford Sales & Serv., Inc.*, 206 F. Supp. 2d 947, 951 (N.D. Ill. 2002).

Dated:  June 3, 2014

Respectfully submitted,

**HSBC NORTH AMERICA HOLDINGS INC.; HSBC FINANCE CORPORATION; HSBC MORTGAGE CORPORATION (USA); HSBC MORTGAGE SERVICES INC.; HSBC USA INC.; HSBC BANK USA, NATIONAL ASSOCIATION; BENEFICIAL COMPANY LLC; DECISION ONE MORTGAGE COMPANY, LLC; and HFC COMPANY LLC**

By:    */s/ Andrew L. Sandler*

Andrew L. Sandler *(pro hac vice)*
Valerie L. Hletko *(pro hac vice)*
Ann D. Wiles *(pro hac vice)*
Mark E. Rooney *(pro hac vice)*
BUCKLEYSANDLER LLP
1250 24th St. NW, Suite 700
Washington, D.C.  20037
(202) 349-8000 (Telephone)
(202) 349-8080 (Facsimile)
asandler@buckleysandler.com
vhletko@buckleysandler.com
awiles@buckleysandler.com
mrooney@buckleysandler.com

Richard E. Gottlieb
Brett J. Natarelli
BUCKLEYSANDLER LLP
123 N. Wacker Dr., Suite 1450
Chicago, IL 60606
(312) 924-9837 (Telephone)
(312) 924-9899 (Facsimile)
rgottlieb@buckleysandler.com
bnatarelli@buckleysandler.com

*Attorneys for Defendants*

**APPENDIX 1**
Factual Allegations Advanced in Support of Plaintiff's Claim

| DATE | SOURCE | COMPLAINT PARAGRAPH |
|------|--------|---------------------|
| Dec. 14, 2004 | "Subprime Loan Market Grows Despite Troubles," USA Today | FAC ¶ 8 |
| May 31, 2006 | Gruenstein, Bocian, Ernst and Li, "Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages" | FAC ¶ 56 |
| June 13, 2006 | Congressional Testimony of Keith S. Ernst, Senior Policy Counsel, Center for Responsible Lending, before the Subcommittee on Financial Institutions and Consumer Credit | FAC ¶ 52 |
| Revised Sept. 18, 2006 | Robert B. Avery, Kenneth P. Brevoort and Glenn B. Canner, "Higher-Priced Home Lending and the 2005 HMDA Data," Federal Reserve Bulletin, A124, A159 | FAC ¶ 50 |
| Oct. 18, 2006 | Martin J. Gruenberg, Address to the Conference on Hispanic Immigration to the United States: Banking the Unbanked Initiatives in the U.S. | FAC ¶ 50 |
| Oct. 25, 2007 | Economic Impact on Wealth, Property Values and Tax Revenues, and How We Got Here, Report & Recommendations by Majority Staff of Joint Economic Committee | FAC ¶ 234 |
| Dec. 3, 2007 | "Subprime Debacle Traps Even Very Creditworthy," Wall Street Journal | FAC ¶ 8 |
| Dec. 3, 2007 | "Fed Shrugged as Subprime Crisis Spread," Wall Street Journal | FAC ¶ 9 |
| Apr. 24, 2009 | Mike Mcintire, "Tracking Loans Through a Firm That Holds Millions," N.Y. Times | FAC ¶ 200 |
| July 28, 2009 | Congressional Testimony of Keith S. Ernst, Center for Responsible Lending, before the Joint Economic Committee of Congress, "Current Trends in Foreclosure and What More Can be Done to Prevent Them" | FAC ¶ 232 |
| July 28, 2009 | Statement of William B. Shear, Director Financial Markets and Community Investment, Testimony Before the Joint Economic Committee U.S. Congress, "HOME MORTGAGES Recent Performance of Nonprime Loans Highlights the Potential for Additional Foreclosures," GA0-09-922T | FAC ¶¶ 9, 242 |
| Jan. 2009 | E. Harnick, "The Crisis In Housing and Housing Finance: What Caused It? What Didn't? What's Next?," 31 Western New England L. Rev. 625, 628 | FAC ¶ 233 |
| Jan. 2010 | Report to Congress on the Root Causes of the Foreclosure Crisis, Report of Department of Housing and Urban Development | FAC ¶¶ 232, 233, 237, 239 |
| June 18, 2010 | D. Gruenstein, Bocian, W. Li and K. Ernst, "Foreclosures by Race and Ethnicity: The Demographics of a Crisis" | FAC ¶ 302 |

| DATE | SOURCE | COMPLAINT PARAGRAPH |
|---|---|---|
| Jan. 2011 | "The Financial Crisis Inquiry Report," Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States | FAC ¶ 212 |
| Nov. 2011 | D. Gruenstein, Bocian, W. Li, C. Reid & R. Quercia, "Lost Ground, 2011: Disparities in Mortgage Lending And Foreclosures" | FAC ¶¶ 244-248 |
| Nov. 2011 | "Vacant Properties, Growing Number Increases Communities' Costs and Challenges," Report to the Ranking Member, Subcommittee on Regulatory Affairs, Stimulus Oversight, and Government Spending, Committee on Oversight and Government Reform, House of Representatives, GA0-12-34 | FAC ¶¶ 287-89 |

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Agenda, Meeting of the Cook County Board of Commissioners (Jan. 9, 2008) |
| B | Resolution 08-R-361, Cook County Board of Commissioners (Sept. 17, 2008) |
| C | Press Release, Illinois Attorney General Lisa Madigan, Madigan Sues Wells Fargo for Discriminatory and Deceptive Mortgage Lending Practices (July 31, 2009) |
| D | Report on the Progress of the Multi-City Litigation Work Group on Foreclosures (Apr. 14, 2009) |
| E | Thomas Hargrove, *The Lost Decade: Cook County Loses 26% of Manufacturing Jobs*, CHI. SUN-TIMES, Nov. 25, 2011 |
| F | Cook County, 5 Year Strategic Plan (2010-2015) |
| G | Declaration of Phyllis I. Johnston |