IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| COUNTY OF COOK, | ) | |
| | ) | |
| Plaintiff, | ) | 14-cv-2031 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| HSBC NORTH AMERICA HOLDINGS | ) | |
| INC.; HSBC FINANCE CORPORATION; | ) | |
| HSBC MORTGAGE CORPORATION | ) | |
| (USA); HSB MORTGAGE SERVICES | ) | |
| INC.; HSBC USA INC.; HSBC BANK | ) | |
| USA; NATIONAL ASSOCIATION; | ) | |
| BENEFICIAL COMPANY LLC; | ) | |
| DECISION ONE MORTGAGE | ) | |
| COMPANY, LLC; HFC COMPANY LLC | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Cook County has filed a claim under the Fair Housing Act ("FHA") 42 U.S.C.

§§ 3601–19, against Defendants HSBC North America Holdings, Inc., and its

various subsidiaries and affiliates. The County alleges that Defendants

discriminatorily targeted minority homeowners in Cook County for predatory

subprime mortgage loans, which resulted in thousands of housing foreclosures.

According to the County, these foreclosures in turn caused a decline in tax revenue,

an erosion of the County's tax base, harm to the County's ability to provide services

to its residents, and general urban blight. Defendants move to dismiss the County's

Amended Complaint, arguing that it lacks constitutional and statutory standing to

maintain this claim. Defendants also contend that the FHA claim is barred by the

statute of limitations and, alternatively, fails to state a claim. For the following reasons, Defendants' motion to dismiss is denied.

## I. Factual Background[1]

Cook County brings claims of intentional discrimination, disparate impact, and disparate treatment under the Fair Housing Act ("FHA") against Defendants. The gist of the County's claim is that Defendants targeted minority borrowers for their subprime mortgage products, designed those loans to fail, and, consequently, caused thousands of foreclosures in Cook County resulting in widespread economic and noneconomic harm. In so doing, at least according to the County, Defendants engaged in discriminatory lending practices and implemented facially-neutral practices that had a racial disparate impact. The County's Amended Complaint contains a slew of allegations describing the subprime mortgage lending crisis in general and Defendants' lending practices in particular. The Court will attempt to summarize them below.

Predatory lending was rampant in the subprime mortgage industry between 2003 and 2007. *See generally* Am. Compl. ¶¶ 8–9, 47–58. During this time, African-American and Latino borrowers were more likely to pay higher prices for mortgage loans than Caucasian borrowers. *See id.* ¶ 50. Data collected pursuant to the Home Mortgage Disclosure Act ("HMDA") and analyzed by the Federal Reserve confirms this disparity. *See id.* ¶ 51.

---

[1]    When reviewing Defendants' motion to dismiss, the Court will assume the alleged facts in the Amended Complaint are true and draws all possible inferences in the County's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

The Federal Reserve analysis shows that on average African-American borrowers were 3.1 times more likely than nonminority borrowers to receive a higher-rate home loan; Latino borrowers were 1.9 times more likely. *See id.* ¶ 52. Other statistics show similar patterns: African-Americans were 37.5 percent more likely to receive a higher-priced conventional home-purchase loan, and 28.3 percent more likely to receive a higher-priced refinance loan. *See id.* ¶¶ 53–54. A U.S. Department of Housing and Urban Development study found that, in neighborhoods where at least 80% of the population was African-American, borrowers were 2.2 times more likely to refinance with a subprime lender. *See id.* ¶ 55.

Cook County alleges that Defendants intentionally targeted and marketed to borrowers in predominantly minority areas in the County in order to grow their subprime mortgage lending business. *See id.* ¶¶ 41–46. Defendants used sophisticated algorithmic modeling to target minority borrowers as well as software programs to process credit bureau information in an effort to identify consumers best suited to receive and respond to subprime mortgage marketing materials. *See id.* ¶¶ 76, 78, 80–87. The targeting marketing strategy undergirded a general strategy of "upselling" to minority borrowers. *See id.* ¶ 79.

When selling these loan products to minority borrowers, Defendants engaged in discretionary pricing practices that resulted in higher costs of borrowing for minority borrowers. *See id.* ¶¶ 100-105. In fact, even after controlling for credit risk, minority borrowers were substantially more likely to pay higher charges on the

loan products Defendants offered as compared to similarly situated nonminority borrowers. *See id.* ¶¶ 109, 112–13. Furthermore, Defendants incentivized their employees to override or circumvent underwriting criteria to steer otherwise qualified minority borrowers to higher cost loans than those provided to similarly situated nonmiority borrowers and to approve otherwise unqualified minority borrowers for high cost loans. *See id.* ¶ 131.

In addition, the County alleges that, even after the financial crisis, Defendants continued to engage in these practices by continuing to impose and enforce the discriminatory pricing terms and servicing the predatory loans in a discriminatory manner for financial gain. *See generally id.* ¶¶ 259–281. These ongoing predatory and discriminatory mortgage lending and servicing practices effectively diluted or, in some cases, eliminated the equity the borrowers had in their homes, thereby placing them in greater risk of delinquency, default and eventual foreclosure. *See id.* ¶¶ 282, 284–85.

The large volume of defaults in the affected communities lowered home values, decreased county tax revenues, and resulted in vacant or abandoned properties that forced the County to provide additional services in these communities at increased costs. *See id.* ¶ 285. In fact, based upon academic literature, the County estimates that each foreclosure resulted in up to $34,000 in community wide damages. *See id.* ¶ 307.

## II. Legal Standards

### A.      Rule 12(b)(1) and Subject Matter Jurisdiction

A motion to dismiss pursuant to Rule 12(b)(1) tests the jurisdictional sufficiency of the complaint. "When ruling on a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the district court must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). But "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993) (quoting *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir. 1979)). "[I]f the complaint is formally sufficient but the contention is that there is in fact no subject matter jurisdiction, the movant may use affidavits and other material to support the motion." *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012). "The burden of proof on a 12(b)(1) issue is on the party asserting jurisdiction." *Id.*

### B.      Rule 12(b)(6) and Failure to State a Claim

To survive a motion to dismiss pursuant to Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations in the complaint must at least "raise a right to relief above the

speculative level." *Bell Atl. Corp.*, 550 U.S. at 555. The Court must accept as true all well-pleaded allegations in the complaint and draw all possible inferences in the plaintiff's favor. *See Tamayo*, 526 F.3d at 1081. Mere legal conclusions, however, "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

### III. Analysis

#### A.    Article III Standing

Defendants first argue, under Rule 12(b)(1), that the Court lacks subject matter jurisdiction over the County's FHA claim because the County does not possess Article III standing to pursue it. Article III standing requires that the County plead: "(i) an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical; (ii) a causal relation between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged action of the defendant; and (iii) a likelihood that the injury will be redressed by a favorable decision." *Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 489 (7th Cir. 2004) (quotations omitted); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992). At the pleadings stage, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 598 (2007); *see also Warth v. Seldin*, 422 U.S. 490, 508 (1975) (a plaintiff "must allege specific, concrete facts demonstrating that the challenged practices

harm him, and that he personally would benefit in a tangible way from the court's intervention.").

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. But "[a] motion to dismiss for lack of standing should not be granted unless there are no set of facts consistent with the complaint's allegations that could establish standing." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 498 (7th Cir. 2005). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

Here, Defendants contend that the County fails to plead the requisite injury-in-fact as well as the causal relationship necessary to satisfy Article III. [2]

### 1. Injury-in-Fact

Turning first to the injury-in-fact inquiry, "[t]o confer standing, an injury must be 'particularized,' meaning that it 'must affect the plaintiff in a personal and individual way.'" *Lac Du Flambeau Band*, 422 F.3d at 496 (quoting *Defenders of Wildlife*, 504 U.S. at 560 n.1). According to Defendants, the County only alleges a "general decrease in tax revenue," an "increase in cost of government services," a county-wide increase in the tax digest, and a generalized increase in "out-of-pocket

---

[2] Defendants do not contest the third requirement for Article III standing–redressability. *See* Pl.'s Mem. Opp'n 9 (noting the failure to address this element). In any event, the Court is convinced that the County's alleged injuries are sufficiently redressable.

costs," none of which, Defendants argue, meet Article III's requirement of a concrete, particularized injury. *See* Am. Compl. ¶¶ 285, 298, 310. The County counters that it has alleged numerous concrete and particularized injuries, including: (1) various economic harms; (2) noneconomic harms to the community, including deterioration and blight; and (3) harms to the County's ability to govern due to financial strain on various agencies and departments. *See* Pl.'s Mem. Opp'n 7 n.14 (citing Am. Compl. ¶¶ 3, 5, 26, 282, 285, 290–98, 300).

The County adequately pleads an injury-in-fact. While the County's asserted economic harms may be "general" at this point, "the particularity requirement does not mean . . . that a plaintiff lacks standing merely because it asserts an injury that is shared by many people." *Lac Du Flambeau Band*, 422 F.3d at 496. Nor are these harms not "concrete" because they are general economic harms. *See Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 110–11 (1979) (tax base harm to village qualified as a concrete injury for standing purposes under the FHA). And as the Seventh Circuit has noted, "a plaintiff suing pursuant to the FHA need not be a member of the class that was the object of discrimination to satisfy the injury-in-fact requirement." *Gorski v. Troy*, 929 F.2d 1183, 1189 (7th Cir. 1991). The precise nature and extent of the economic harms can be ferreted out through discovery. *See* Pl.'s Mem. Opp'n 7, n.14 (noting that the decline in property values can be "precisely determined through regression analysis").

In addition to economic harms, the County alleges noneconomic harms as well, including urban blight, community deterioration, and organizational harm

suffered by the County due to increased costs and decreased revenue. It is well-established that such noneconomic harms satisfy Article III's injury-in-fact requirement under the FHA. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262–63 (1977) ("It has long been clear that economic injury is not the only kind of injury that can support a plaintiff's standing" under the FHA); *see also Sierra Club v. Morton*, 405 U.S. 727, 734–735 (1972) (noneconomic injuries suffice for standing purposes). Here, the County has alleged harms sufficient to satisfy Article III's injury-in-fact requirement.

### 2. Causation

To satisfy the causation prong of Article III standing, the injury complained of "must be fairly traceable to the challenged action of the defendant — i.e., there must be a causal connection between the injury and the conduct." *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014). "If the plaintiff's injury is not fairly traceable to the defendant, the plaintiff lacks standing to bring suit against the defendant, and the federal court lacks subject-matter jurisdiction to adjudicate the matter." *Johnson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 719 F.3d 601, 602 (7th Cir. 2013). Importantly, "a plaintiff does not lack standing merely because the defendant is one of several persons who caused the harm." *Lac Du Flambeau Band*, 422 F.3d at 500. But "[i]f the 'independent action of some third party not before the court' causes [Plaintiff's harm], then the complaint fails the traceability test." *Sierra Club v. Franklin Cnty. Power of Illinois, LLC*, 546 F.3d

918, 926 (7th Cir. 2008) (quoting *Texas Indep. Producers & Royalty Owners Ass'n v. EPA,* 410 F.3d 964, 972 (7th Cir. 2005)).

In its allegations, the County traces a causal connection between Defendants' discriminatory lending practices, on the one hand, and high rates of loan defaults and the resulting home foreclosures, on the other.

- Defendants intentionally employed discriminatory practices by making loans that were designed to fail and targeting these loans to minority borrowers; these practices included top-down corporate level policies implementing the scheme and continued servicing of the predatory loans until failure. *See* Am. Compl. ¶¶ 4, 7, 44, 61–65, 68–69, 73–75, 78–132, 139, 141–80, 233–35, 237–39, 259–81, 316, 318.

- Defendants supported loan originations, wholesale loan purchases, and the funding of loans made by brokers in minority communities and concealed their scheme while their actions caused increased loan defaults, home vacancies, and foreclosures in the County. *See* Am. Compl. ¶¶ 4–15, 19, 21–22, 24–26, 221–46, 248–58.

- Defendants' lending and securitization practices, in concert with other industry participant's practices, caused the financial crisis of 2008. *See* Am. Compl ¶¶ 4, 19, 25, 221–43.

- Congressional and statistical findings support the County's position that the predatory loan terms and manner in which the loans were made, underwritten, and serviced caused the historically unprecedented loan defaults and foreclosures that disparately impacted Plaintiff's communities.. *See* Am. Compl. ¶¶ ¶¶ 8, 9, 15, 19, 50–58, 109, 112–13, 229–258, 282–89, 298, 304

Defendants do not seriously dispute the link between home foreclosures and the economic and noneconomic injuries alleged by the County here. It is quite plausible that a high number of foreclosures and their accompanying vacancies would cause a reduction in property values, an erosion of the tax base, an increase in the need for costly municipal services, as well as, at times, blight and aesthetic

10

decline. Rather, they argue that the foreclosures could have been caused by a number of factors, other than the alleged discriminatory conduct, such as a loss of employment, illness, or other personal tragedies. This may be true, but "a plaintiff does not lack standing merely because the defendant is one of several persons who caused the harm." *Lac Du Flambeau Band*, 422 F.3d at 500. Where, as here, the alleged conduct plausibly contributed to the harm, Article III standing exists. *See Smith v. United Residential Servs. & Real Estate, Inc.*, 837 F. Supp. 2d 818, 825 (N.D. Ill. 2011) (noting that allegations of loan discrimination sufficient for causation at the pleading stage); *see also Steele v. GE Money Bank*, No. 08 C 1880, 2009 WL 393860, at *5 (N.D. Ill. Feb. 17, 2009).

Defendants also rely on the argument that the County has identified no *specific* properties in its complaint. In support of this argument, Defendants cite to *Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A.*, 677 F. Supp. 2d 847, 850 (D. Md. 2010), and *City of Birmingham v. Citigroup Inc.*, No. CV-09-BE-467-S, 2009 WL 8652915, at *1 (N.D. Ala. Aug. 19, 2009). But *Baltimore* and *Birmingham* are not controlling on this Court, and in any event, the Court declines to adopt their reasoning.

As the County points out, *Birmingham* relied heavily on *Tingley v. Beazer Homes Corp.*, No. 3:07–CV–176, 2008 WL 1902108 (W.D.N.C. Apr. 25, 2008), a case that did not examine *Gladstone*, the seminal case. *See* 2009 WL 8652915, at *3. Moreover, *Birmingham* did not discuss any of the allegations in the complaint in its analysis. *City of Los Angeles*, 24 F. Supp. 3d at 950. As for *Baltimore*, the court

initially dismissed the city's complaint for failure to allege the number of properties subject to foreclosure due to the defendants' loan practices. 677 F. Supp. 2d at 850. But the court subsequently allowed the case to go forward once the city had alleged that specific properties would have been vacant "but for" the challenged conduct. *See Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A.*, No. CIV. JFM-08-62, 2011 WL 1557759, at *3 (D. Md. Apr. 22, 2011). The County here has made the same allegations.

Additionally, Defendants argue that the "chain of causation" between the challenged lending practices and the alleged injury simply does not exist as a matter of fact. But, such arguments are the kind of "factual" as opposed to "facial" attack on jurisdiction that is more appropriate after discovery. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) ("[A] factual challenge lies where the complaint is formally sufficient but the contention is that there is in fact no subject matter jurisdiction.") (internal quotations omitted). Once causation is sufficiently pleaded, further adjudication of causality is better left to summary judgment. *See Steele*, 2009 WL 393860, at *5 (noting that factual disputes over causation "cannot be resolved via a motion to dismiss"). Here, the County alleges that Defendants made discriminatory loans on properties located within its community. Measured against the background principle that "[a] motion to dismiss for lack of standing should not be granted unless there are no set of facts consistent with the complaint's allegations that could establish standing," the County has

sufficiently alleged Article III causation to establish constitutional standing. *See Lac Du Flambeau Band*, 422 F.3d at 498.

## B. "Statutory Standing" and *Lexmark International*

Defendants also argue that the County lacks statutory standing—also known as "prudential standing"—and point to *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377 (2014). In *Lexmark*, the Supreme Court shifted the landscape of prudential standing analysis. Finding the label "prudential standing" to be "misleading," the Supreme Court instead adopted the "zone of interests" test, noting that "[w]hether a plaintiff comes within 'the zone of interests' is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id*. at 1387. "In sum, the question . . . is whether [plaintiff] falls within the class of plaintiffs whom Congress has authorized to sue under [the statute]." *Id*; *see Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 733–34 (7th Cir. 2014) (holding "whether a plaintiff may sue 'is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim'") (quoting *Lexmark*, 134 S.Ct. at 1387).[3]

---

[3] The majority of other circuit courts are in accord. *See, e.g.*, *Kurapati v. U.S. Bureau of Citizenship & Immigration Servs.*, 775 F.3d 1255, 1260 (11th Cir. 2014) ("The term prudential standing implies that whether a particular plaintiff falls within the 'zone of interests' protected by a statute or regulation is jurisdictional, but whether a plaintiff's claim is within the zone of interests protected by a statute or regulation is not jurisdictional."); *Niemi v. Lasshofer*, 770 F.3d 1331, 1345 (10th Cir. 2014) (discussing *Lexmark* and noting that "the Supreme Court has affirmed that questions of so-called 'statutory standing' like the one presented in this case, despite no longer falling under the

13

Accordingly, under *Lexmark*, a plaintiff that brings a statutory cause of action must, in addition to meeting Article III's "case or controversy" requirement, show that: (1) its injury is within the "zone of interests" protected by the statute and (2) its injury was proximately caused by a violation of the statute. 134 S.Ct. at 1388-91. Defendants argue that the County fails to satisfy these two requirements of statutory standing.

### 1. "Zone of Interests" and the FHA

Starting with the statutory text, the FHA authorizes any "aggrieved person" to file suit. 42 U.S.C. § 3613. "An aggrieved person" is anyone who "claims to have been injured by a discriminatory housing practice," or "believes that such person will be injured by a discriminatory housing practice that is about to occur." *Id.* §

---

technical label of prudential standing, are not jurisdictional"); *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 200–01 (2d Cir. 2014) (differentiating statutory standing and noting that "has at times been held to be jurisdictional and at others nonjurisdictional"); *Janvey v. Brown*, 767 F.3d 430, 437 n.26 (5th Cir. 2014) (noting that "[a]lthough often clothed as an issue of subject-matter jurisdiction," statutory standing is not jurisdictional); *El Dorado Estates v. City of Fillmore*, 765 F.3d 1118, 1122 (9th Cir. 2014) ("[T]he Supreme Court indicated that the question of whether a particular plaintiff has a right to sue under a given substantive statute, though often previously discussed as 'prudential standing,' is more appropriately dealt with not in terms of standing but instead as a matter of statutory interpretation, determining 'whether a legislatively conferred cause of action encompasses a particular plaintiff's claim.'"); *Vander Luitgaren v. Sun Life Assur. Co. of Canada*, 765 F.3d 59, 63, n.3 (1st Cir. 2014) (citing *Lexmark* and applying its test while not deciding "whether, strictly speaking, questions of statutory standing are jurisdictional questions"); *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 596 n.3 (6th Cir. 2014) (noting that *Lexmark* "placed the continuing vitality of the prudential aspects of standing" in doubt); *Sierra Club v. E.P.A.*, 755 F.3d 968, 976 (D.C. Cir. 2014) (noting that under *Lexmark* "prudential standing" and "zone of interests" are "not a question of standing" but "whether characterized as prudential standing or legal capacity to state a claim" plaintiff's lawsuit failed); *Nat'l Health Plan Corp. v. Teamsters Local 469*, 585 F. App'x 832, 835 (3d Cir. 2014) ("*Lexmark* adopted a straightforward cause-of-action analysis.").

3602(i).  Defendants argue that the County does not fall within this definition and, as a result, has no statutory standing to sue under the FHA.

Any review of standing under the FHA must start with the Supreme Court's decision in *Gladstone Realtors v. Village of Bellwood*.  There, a group of resident "testers" and the local municipality filed claim under the FHA, alleging racially discriminatory conduct on the part of real estate brokerage firms and their employees.  The *Gladstone* defendants argued, among other things, that the Village lacked standing under the statute.  The Supreme Court found otherwise, stating:

> A significant reduction in property values directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services. Other harms flowing from the realities of a racially segregated community are not unlikely.  As we have said before, there can be no question about the importance to a community of "promoting stable, racially integrated housing.  If, as alleged, petitioners' sales practices actually have begun to rob Bellwood of its racial balance and stability, the village has standing to challenge the legality of that conduct.

441 U.S. at 110–11.  The Supreme Court then concluded, "Standing under § 812, like that under § 810, is as broa[d] as is permitted by Article III of the Constitution."  *Id.* at 109 (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972)).

In *Havens Realty Corp. v. Coleman*, the Supreme Court reaffirmed its holding in *Gladstone*: "Congress intended standing under § 812 [of the FHA] to extend to the full limits of Art. III and that the courts accordingly lack the authority to create prudential barriers to standing in suits brought under that section."  455 U.S. 363, 372 (1982) (quoting *Gladstone*, 441 U.S. at 103, n.9).  In so doing, the Supreme Court discussed the distinction between "direct" harm and "indirect harm" under

the FHA: "the concept of 'neighborhood' standing differs from that of 'tester' standing in that the injury asserted is an indirect one: an adverse impact on the neighborhood in which the plaintiff resides resulting from the steering of persons other than the plaintiff . . . . By contrast, the injury underlying tester standing—the denial of the tester's own statutory right to truthful housing information caused by misrepresentations to the tester—is a direct one." *Id.* at 375. The Court, however, determined that the distinction was of little significance because "the only requirement for standing to sue under § 812 is the Art. III requirement of injury in fact." *Id.* at 375–76.

The Seventh Circuit, after examining *Gladstone* and *Havens Realty*, has explicitly noted that "[t]he [Supreme] Court held that the only requirement for standing to sue under the FHA is the Art. III *minima* of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered a distinct and palpable injury." *Gorski*, 929 F.2d at 1188 (examining *Gladstone* and *Havens Realty*) (internal quotations omitted*); see also New W., L.P. v. City of Joliet*, 491 F.3d 717, 721 (7th Cir. 2007) ("[T]he Supreme Court has held that only the Constitution's own requirements, and not any prudential supplements, apply to litigation under [the FHA]."); *Alschuler v. Dep't of Hous. & Urban Dev.*, 686 F.2d 472, 477 (7th Cir. 1982) ("[T]he [Supreme] Court in *Trafficante* . . . held that Congress intended to define standing [under the FHA] as broadly as is permitted by Article III.").

In short, "[b]oth *Gladstone* and *Havens Realty* exemplify the Court's recognition of the congressional intent to apply broad standing principles under the Act." *Gorski*, 929 F.2d at 1188. The County meets these broad standing principles here. It has alleged a rather straightforward FHA claim: Defendants targeting minority borrowers for predatory home mortgage loans and imposed higher loan costs and servicing fees on them as compared to similarly situated nonminority borrowers. These discriminatory actions increased the minority borrowers' risks of default and foreclosure, resulting in a rash of foreclosures in the county, which in turn caused economic and noneconomic injury to the County. Taking these allegations to be true, the County satisfies the requirements of Article III standing as discussed above and, consequently, falls within the zone of interests of the FHA.

For their part, Defendants rely on *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011), which they argue narrowed the "person aggrieved" inquiry under the "zone of interests" test and abrogated *Trafficante* and *Gladstone*. But *Thompson* was a case decided under Title VII, not Title VIII; and this Court is obliged to follow the Seventh Circuit's adoption of *Gladstone*, until the Supreme Court or the Seventh Circuit expressly states otherwise.

The Court recognizes that a recent decision in this district has taken a different view, holding that *Thompson* effectively overruled *Gladstone* in substance, if not in word. *See Cnty. of Cook v. Wells Fargo & Co.*, No. 14 C 9548, 2015 WL 4397842, at **5-6 (N.D. Ill. July 17, 2015). But this holding appears in tension with *Gorski* and the other Seventh Circuit cases discussed above, and the Court declines

to adopt such a sweeping view of *Thompson* given existing Seventh Circuit precedents. Instead, this Court agrees with another court in this district that found statutory standing under similar circumstances. *See Cnty. of Cook v. Bank of Am. Corp.*, No. 14 C 2280, 2015 WL 1303313, at *4 (N.D. Ill. Mar. 19, 2015) (examining *Thompson* but holding that, because of *Gladstone*, "the term 'aggrieved' in [the FHA] reaches as far as Article III permits").

Defendants also rely on *Alschuler* for its narrower application of the "zone-of-interests" test under the FHA. But *City of Milwaukee v. Block*, 823 F.2d 1158, explicitly abrogated this aspect of *Alschuler*. *See Cornell Vill. Tower Condo. v. Dep't of Hous. & Urban Dev.*, 750 F. Supp. 909, 919 (N.D. Ill. 1990).

This leaves Defendants' reliance on several cases from other districts, principally *City of Miami v. Bank of Am. Corp.*, No. 13-24506-CIV, 2014 WL 3362348 (S.D. Fla. July 9, 2014). There, the district court held that the City of Miami lacked statutory standing to bring FHA claims against a bank based on allegations similar to those here. But the Eleventh Circuit recently reversed stating, "Simply put, *Trafficante*, *Gladstone*, and *Havens* have never been overruled, and the law of those cases is clear as a bell: '[statutory] standing under [the FHA] extends as broadly as is permitted by Article III of the Constitution.'" *City of Miami v. Bank of Am. Corp.*, --- F.3d ----, No. 14-14543, 2015 WL 5102581, at *11 (11th Cir. Sept. 1, 2015) (quoting *Gladstone*, 441 U.S. at 98). In arriving at this decision, the Eleventh Circuit considered the contrary ruling in this district in *Cnty. of Cook v. Wells Fargo & Co.*, but concluded that "*Thompson* itself was a Title VII case, not a

Fair Housing Act case . . . . *Thompson* surveyed *Trafficante* and *Gladstone*, but did not explicitly overrule them—nor could it, given the different statutory context in which it arose." *Id.* at *12.

For these reasons, the Court holds that the County meets the requirements of the "zone of interest" test to establish statutory standing under the FHA.

### 2. Proximate Causation

In addition to falling within the FHA's "zone of interest," the County must also show that its injuries were proximately caused by a violation of the statute. *See Lexmark* 134 S. Ct. at 1390. Here, the County has cited to numerous studies and statistical data that link predatory lending practices, such as those alleged here, to the large number of foreclosures in predominantly minority communities. *See, e.g.*, Am. Compl. ¶¶ 244-56. And, based on these data, the County asserts that the large number of foreclosures would not have taken place "but for" the Defendants' discriminatory loan practices. *See, e.g.*, *id.* ¶ 258 ("But for Defendants' predatory and discriminatory actions alleged herein, the foreclosure rate among, and the number of foreclosures experiences by, FHA protected minority borrowers in Plaintiff's communities and neighborhoods would have been far lower."). These allegations are sufficient to survive a motion to dismiss. *See City of Miami*, --- F.3d ----, 2015 WL 5102581 at ** 16–17 (finding plaintiff's allegations sufficient to plead proximate cause); *Cnty. of Cook*, 2015 WL 1303313 at *4 (finding that "the causal connection between Defendants' alleged conduct and the County's injuries is at least plausible.").

Nevertheless, Defendants argue that the County has not met the proximate causation standard because it has not identified *specific* properties that were subject to foreclosure due to the alleged conduct. But, again, this amounts to a factual attack on causation that is best deferred to a motion for summary judgment. *See Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1152 (7th Cir. 2010) ("[T]he lack of proximate cause should only be determined by the court where the facts alleged do not sufficiently demonstrate both cause in fact and legal cause" and noting that summary judgment presents another opportunity to raise the issue, "at which point [the plaintiff] will have to do more than simply allege proximate cause.").

### C.    The Statute of Limitations

Defendants also argue that the County's claims are barred by the statute of limitations. The FHA provides that "[a]n aggrieved person may commence a civil action . . . not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice . . . whichever occurs last." 42 U.S.C. § 3613(a)(1)(A). The County filed its lawsuit on March 21, 2014, and therefore the relevant two-year period reaches back to March 21, 2012. According to Defendants, the County offers no allegations of incidents after 2007; moreover, to cover all bases, Defendants contend that the continuing violation doctrine does not apply. Defendants' arguments are unavailing.

Here, the County has alleged that Defendants are still engaged in their discriminatory mortgage lending practices and continue to service the loans in a discriminatory manner. *See, generally* Am. Compl. ¶¶ 259–81. "[W]here a plaintiff,

pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice." *Havens Realty,* 455 U.S. at 380–81. Under both the plain language of 42 U.S.C. § 3613(a)(1)(A) and the reasoning of *Havens Realty*, which § 3613(a)(1)(A) codified, the County's claims do not run afoul of the statute of limitations.

In any event, Defendants' statute of limitations argument is premature. A motion to dismiss on an affirmative defense like statute of limitations is typically inappropriate. "[W]here a defendant raises the statute of limitations as an affirmative defense at the motion to dismiss stage, a court can only dismiss a claim 'when [the] complaint plainly reveals that an action is untimely under the governing statute of limitations." *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004). *See Jovic v. L-3 Servs., Inc.*, --- F.Supp.3d ----, No. 10 C 5197, 2014 WL 4748614, at *11 (N.D. Ill. Sept. 24, 2014) (quoting *Andonissamy v. Hewlett–Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008)). This rule, of course, applies to FHA claims. *See, e.g.*, *Jafri v. Chandler LLC*, 970 F. Supp. 2d 852, 865 (N.D. Ill. 2013) ("[L]imitations defense fails at the pleadings stage" where the complaint does not admit the ingredients of a statute of limitations defense).

Here, the Court cannot say that the County has pleaded itself out of court on statute of limitations grounds. Accordingly, Defendants' motion to dismiss based upon the statute of limitations is denied.

### D.     Failure to State a Claim

Lastly, Defendants argue that the County fails to state claims for intentional discrimination-disparate treatment or disparate impact under the FHA.  Under the FHA it is "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race . . . ." 42 U.S.C. § 3605(a).  To state an intentional discrimination or disparate treatment claim under the FHA requires allegations "of intentional discrimination, provable via either direct or circumstantial evidence." *Daveri Dev. Grp., LLC v. Vill. of Wheeling*, 934 F. Supp. 2d 987, 997 (N.D. Ill. 2013) (citing *Nikolich v. Vill. of Arlington Heights, Ill.*, 870 F. Supp. 2d 556, 562 (N.D. Ill. 2012)).  To state a disparate impact claim under the FHA requires allegations that Defendants' actions, despite being unintentional, had a "discriminatory effect" upon a protected class.  *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1289–90 (7th Cir. 1977).

The County has sufficiently pleaded both theories.  The County has stated a claim for intentional discrimination and disparate treatment; they allege that the Defendants intentionally targeted and marketed predatory subprime loans to minority borrowers to their detriment and the detriment of the County.  *See, e.g.*, Am. Compl. ¶¶ 64, 68–70, 73,   75–99. The County has also stated a claim of disparate impact; they allege, among other things, that the pricing policies Defendants designed increased the costs for loans made to minority borrowers,

thereby reducing their home equity, and caused a "downward spiral" of mortgage delinquencies and failures amongst minority borrowers. *See, e.g.*, *id.* ¶¶ 109, 112–13.

Defendants also take issue with the County's reliance on *Daveri Development Group*, 934 F. Supp. 2d 987, and *City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-2857-STA, 2011 WL 1706756 (W.D. Tenn. May 4, 2011), arguing that the County has not alleged discriminatory intent. But the County did allege intentional discriminatory conduct. *See, e.g.*, Am. Compl. ¶¶ 64, 68–70, 73, 75–99. Defendants also cursorily argue that the County has not alleged policies or actions undertaken "because of," not merely "in spite of," their adverse effects on an identifiable group. *See* Defs.' Mot. Dismiss 19 (citing *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979); *EEOC v. Chi. Miniature Lamp Works*, 947 F.2d 292, 299 (7th Cir. 1991); *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 886 (7th Cir. 2012)). This argument also is unpersuasive. Again, the County has alleged that the discriminatory pricing policies were undertaken because of the minority status of the borrowers. *See, e.g.*, Am. Compl. ¶¶ 42–61, 75–98, 133–39, 323.

Undeterred, Defendants also cite to *Smith v. City of Jackson*, which held that disparate impact is not cognizable under the Age Discrimination in Employment Act. 544 U.S. 228, 236–38 & n.6 (2005). But the Supreme Court has recently held that disparate impact claims are cognizable under the FHA. *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2525 (2015); *see also Metro. Hous. Dev. Corp.*, 558 F.2d at 1290 ("[A] violation of section

3604(a) can be established by a showing of discriminatory effect without a showing of discriminatory intent.").

Lastly, invoking *Wal-Mart Stores, Inc. v. Dukes*, Defendants argue that the County has failed to plead a disparate impact claim because it has not identified a discrete practice but only a *discretionary* "pricing policy" that does not pass muster. *See* 131 S. Ct. 2541, 2555–56 (2011) ("[T]he bare existence of delegated discretion . . . [that] produced an overall sex-based disparity does not suffice."); *see also Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 656 (1989) (similar). *Dukes* does not save Defendants' argument. First, *Dukes* did not foreclose the possibility that a discretionary policy could be the basis for a claim of disparate impact; indeed, it recognized as much, noting that "a common mode of exercising discretion that pervades the entire company" and produces disparate impact effects might be actionable. *See* 131 S. Ct. at 2554–55. Second, as the County points out, *Dukes* was decided in the context of Rule 23(a)(2)'s commonality requirement, making its discussion of limited import here. *See id.* at 2555–557 (discussing regression analysis and anecdotal evidence in the context of Rule 23(a)(2)).

For these reasons, Defendants' motion to dismiss the County's claims for failure to state a claim is denied.

## E.    Dismissal of Non-Originating Entities

Defendants also argue that HSBC USA Inc., HSBC Finance Corporation, HSBC North America Holdings Inc., HFC Company LLC, and Beneficial LLC should be dismissed because they did not originate mortgage loans. *See* Defs.' Mot.

Dismiss 19–20; Defs.' Reply 15. In essence, Defendants' argument on this point is an argument for summary judgment. The County has alleged a widespread scheme of discriminatory lending which involved *all* the various Defendants. *See* Am. Compl. ¶¶ 31–39 (establishing corporate structure); *id.* ¶ 40 ("Defendants collectively have operated as a common enterprise."). This is sufficient to survive a motion to dismiss.[4]

## IV. Conclusion

For the reasons provided herein, the Court denies Defendants' motion to dismiss [49].

**SO ORDERED**                    **ENTER: 9/30/15**

_____
**JOHN Z. LEE**
**United States District Judge**

---

[4]     Indeed, the Defendants invoke Rule 56 and request that the Court to convert the motion into one for summary judgment. *See* Defs.' Mot. 19 n.19. Given the procedural posture of the case, and the scope of discovery that is likely to come, the Court declines to do so.