IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| COUNTY OF COOK, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 2031 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| HSBC NORTH AMERICA HOLDINGS | ) | |
| INC.; HSBC FINANCE CORPORATION; | ) | |
| HSBC MORTGAGE CORPORATION | ) | |
| (USA); HSB MORTGAGE SERVICES | ) | |
| INC.; HSBC USA INC.; HSBC BANK | ) | |
| USA; NATIONAL ASSOCIATION; | ) | |
| BENEFICIAL COMPANY LLC; | ) | |
| DECISION ONE MORTGAGE | ) | |
| COMPANY, LLC; HFC COMPANY LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff County of Cook ("the County") has filed claims under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–19, against Defendant HSBC North America Holdings, Inc., and its various subsidiaries and affiliates (together, "HSBC"). The County claims that HSBC discriminatorily targeted minority homeowners in Cook County with high-priced predatory subprime mortgage loans and has serviced and foreclosed on those loans in a discriminatory manner. According to the County, these business practices harmed the County by imposing on it out-of-pocket costs for governmental eviction and foreclosure processes, as well as for various social services for evicted homeowners. The County also alleges it lost out on property tax income from foreclosed, abandoned, and vacant properties,

1

as well as neighboring properties, and income from property recording taxes, intangible taxes, and transfer fees. The County also asserts that HSBC's practices injured the fabric of its communities and caused general urban blight.

HSBC moves to dismiss the County's Second Amended Complaint ("Complaint"). For the following reasons, HSBC's motion to dismiss is granted in part and denied in part.

## Factual Background[1]

Beginning in 2003, HSBC engaged in a rampant predatory-lending business program in the subprime mortgage market, which targeted African-American and Latino borrowers in Cook County, Illinois. *See generally* 2d Am. Compl.; *id.* ¶¶ 1–13, 50–58. This program—which the County describes as "equity stripping," because it effectively diluted or eliminated the equity that borrowers had in their homes—comprised numerous components.

### A.    Discriminatory Marketing

First, HSBC intentionally targeted and marketed predatory loan offerings to borrowers in predominantly minority areas. *See id.* ¶¶ 53, 73, 77–79, 84–105. HSBC used sophisticated algorithmic modeling to target minority borrowers, as well as software programs to process credit bureau information, in an effort to identify consumers likely to respond to subprime mortgage marketing materials. *See id.* ¶¶ 84–94. HSBC perceived minority borrowers as being particularly

---

[1]    The Court assumes the factual allegations in the Complaint are true and draws all possible inferences in the County's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

susceptible to its predatory offerings, because such borrowers traditionally lacked access to low cost credit, and because borrowers whose first language was not English had more difficulty evaluating the terms, conditions, and risks of the loan agreements. *Id.* ¶¶ 85, 87–88.

In addition to originating these subprime loans, HSBC also purchased them from other subprime lenders. *Id.* ¶¶ 150–184, 198–99. Because the Home Mortgage Disclosure Act ("HMDA") did not require HSBC to report the ethnicity of borrowers for loans that it purchased from third parties, it reported race or ethnicity on only 141 of the 19,384 mortgage loans it purchased for properties in Cook County between 2004 and 2007, obscuring the racial impact of its practices. *Id.* Along similar lines, the County also alleges that HSBC used the Mortgage Electronic Registration System, Inc., ("MERS") to hide its predatory practices.[2]

## B. Discriminatory Pricing

After HSBC successfully generated leads, it charged minority borrowers higher prices—even after controlling for variables such as credit risk—for mortgage loans, as compared to similarly situated nonminority borrowers. *See id.* ¶¶ 9, 14, 83, 104–22, 136–49. HSBC accomplished this by, among other things, incentivizing

---

[2] According to the Complaint, MERS is "an entity that Defendants and other industry participants created to circumvent proper public recording processes, facilitate the transfer and distribution of mortgage loans among Defendants' corporate structure and securitization instruments, and obfuscate the chain of liability in the foreclosure process." *Id.* ¶ 189. MERS "enable[d] mortgage lenders to privately originate, track, assign and/or trade mortgage loans, circumventing the entire public recording process." *Id.* ¶ 205. This in turn made it extremely difficult for the public "to determine from publicly available data which Defendants hold the mortgages to, are in possession of, and/or are or may be foreclosing on properties in Plaintiff's communities and neighborhoods, further obfuscating the predatory and discriminatory lending practices of Defendants and other industry participants." *Id.* ¶ 210.

its employees to ignore or circumvent conventional underwriting criteria to "steer" minority borrowers to riskier and higher cost loan products, which often had higher default rates. *Id.* ¶¶ 129–49.

Data collected pursuant to the HMDA and analyzed by the Federal Reserve confirms these pricing disparities. *See id.* ¶¶ 56–66. The Federal Reserve analysis shows that, on average, African-American borrowers were 3.1 times more likely than nonminority borrowers to receive a higher-rate home loan; Latino borrowers were 1.9 times more likely. *See id.* ¶ 61. Other statistics show similar patterns: African-Americans were 37.5 percent more likely to receive a higher-priced conventional home-purchase loan and 28.3 percent more likely to receive a higher-priced refinance loan. *See id.* ¶¶ 62–63. A U.S. Department of Housing and Urban Development study found that, in neighborhoods where at least 80% of the population was African-American, borrowers were 2.2 times more likely to refinance with a subprime lender. *See id.* ¶ 64. Additionally, HSBC's own publicly reported HMDA data evidences similar disparities. *Id.* ¶¶ 67, 142–49.

## C.    Discriminatory Foreclosure-Related Activities

While HSBC often sold the mortgage notes to third parties, it retained the right to service and foreclose on the subprime loans it originated and purchased. *Id.* ¶ 283. For loans that it serviced but did not own, HSBC had an incentive to foreclose, rather than offer loss mitigation options (such as loan modifications),

because HSBC earned fees for doing so without having to bear the investment risk. *Id*. ¶¶ 283–88.[3]

HSBC foreclosed on minority homeowners at a higher rate than similarly situated nonminority homeowners. *Id*. ¶¶ 262–305. For example, based on publicly available data, during a period of twelve years prior to the County's filing of the Complaint, HSBC was 2.3 times more likely to foreclose on a home in a neighborhood with 31–50% minority homeowners, as compared to a neighborhood with 30% or fewer minority homeowners. *Id*. ¶ 275. As the concentration of minority homeowners increased to 50–70%, HSBC was 3.8 times more likely to foreclose. *Id*. The rate of foreclosures rose as the rate of minority home ownership in a neighborhood rose. *Id*.

HSBC engaged in several business practices that contributed to these results. For example, HSBC failed to adequately provide loss mitigation options to minority homeowners, as compared to similarly situated nonminority homeowners. *Id*. ¶ 292. HSBC also filed foreclosure lawsuits against minority borrowers, without ensuring that the necessary mortgage loan documents were properly endorsed or assigned and in the possession of the appropriate party. *Id*.

D. **Ongoing Practices**

Although HSBC stopped originating and purchasing subprime loans in 2007, the County claims that HSBC has continued to impose discriminatory pricing terms

---

[3] For loans that HSBC retained, it had an economic incentive to avoid foreclosures so that it could avoid writing down the value of its loan portfolio. *Id*. ¶ 289. In those instances, HSBC did not foreclose even though borrower may have defaulted on the note and abandoned the property. *Id*. ¶¶ 289–90.

and has serviced and foreclosed on the predatory loans in a discriminatory manner. *See id.* ¶¶ 282–305. The County believes that this is borne out by publicly available data regarding HSBC's foreclosures in Cook County between March 2012 and March 2014 and, again, between June 2015 and April 2017, which shows that HSBC initiated foreclosure proceedings at a higher rate for minority borrowers. *Id.* ¶¶ 277–81.

### E.    The County's Alleged Injuries

As a result of HSBC's conduct, the County claims that it has been harmed by having to incur additional costs related to conducting judicial and non-judicial foreclosure-related processes; serving eviction and foreclosure notices; registering and monitoring foreclosed properties; inspecting, securing, maintaining, and/or demolishing foreclosed properties; and providing various types of social services to evicted or foreclosed homeowners. *Id.* ¶¶ 5, 33, 321, 348.

Additionally, the County seeks as damages the loss of tax and other income related to foreclosed, abandoned, and vacant properties (as well as neighboring properties that declined in value) and the resources that it had to provide to communities that suffered from the resulting urban blight. *Id.* The County believes that it will be able to prove these damages at trial with statistical evidence and expert testimony. *Id.* ¶ 349.

Finally, the County seeks damages for the recording fees, transfer fees, and intangible tax income it lost when HSBC used MERS to allegedly obscure its

transactions from public recording systems in an effort to hide its race-based activities. *Id.* ¶¶ 5, 33, 321.

## F. The County's Claims

In Count I, the County claims that HSBC's predatory program has disparately impacted minority borrowers in violation of the FHA. *Id.* ¶¶ 350–73. In Count II, the County alleges that the foreclosure component of HSBC's program, standing alone, has disparately impacted minorities in violation of the FHA. *Id.* ¶¶ 374–87. In Count III, the County contends in the alternative that HSBC's practices have constituted disparate treatment of minority borrowers. *Id.* ¶¶ 388–96.

HSBC has moved to dismiss all three counts. It argues that the County has failed to adequately plead that HSBC's conduct was the proximate cause of the County's injuries; state disparate-treatment and disparate impact claims; file its claims in a timely fashion; and adequately plead that various HSBC subsidiaries and affiliates named as Defendants were involved in the alleged conduct.

## Legal Standards

To survive a motion to dismiss pursuant to Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations in the complaint must at least "raise a right to relief above the speculative level." *Bell Atl. Corp.*, 550 U.S. at 555. The Court must accept as true all well-pleaded allegations in the complaint and draw all possible inferences in the

plaintiff's favor. *See Tamayo*, 526 F.3d at 1081. Mere legal conclusions, however, "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

Moreover, the County must plausibly plead that its injuries were proximately caused by a violation of the FHA. *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1306 (2017).

<u>Analysis</u>

## I.     Proximate Cause

### A.     *City of Miami* and Directness Principles

HSBC's principal argument is that the County's claims should be dismissed because the County's allegations are insufficient to show that HSBC's challenged conduct was the proximate cause of the County's injuries. Defs.' Mem. Supp. at 4–12.     As both sides recognize, the controlling case is the Supreme Court's recent decision in *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296 (2017).

There, the City of Miami alleged that Bank of America and Wells Fargo intentionally issued risky mortgages on terms less favorable to minority customers than similarly situated white customers. *Id.* at 1301. Much like here, the city alleged that these lending practices adversely impacted the racial composition of the city; impaired its goals of promoting racial integration and desegregation; frustrated its interest in promoting fair housing; and disproportionately caused foreclosures and vacancies in minority communities. *Id.* The foreclosures, in turn, decreased the property value of both the foreclosed homes and other homes in Miami

neighborhoods and, concomitantly, reduced tax revenues and forced the city to spend more for municipal services in blighted neighborhoods. *Id.* at 1301–02.

Noting the "broad reach" of the term "aggrieved person" as defined in the FHA, the Supreme Court reaffirmed its prior holding that Congress intended "to define standing [in the FHA] as broadly as is permitted by Article III of the Constitution." *Id.* at 1303 (citations and internal quotations omitted). From this, the Supreme Court held that the financial injuries alleged by Miami as a result of the banks' actions fell with "the zone of interest that the FHA protects," *id.* at 1304. As to the question of causation, however, the Supreme Court took a more exacting approach.

The Eleventh Circuit had held that Miami's allegations satisfied the causation requirement, because the city had "plausibly alleged that its financial injuries were foreseeable results of the Banks' misconduct." *Id.* at 1305. The Supreme Court disagreed with this broad foreseeability test, holding that "foreseeability alone is not sufficient to establish proximate cause under the FHA." *Id.* This is because "[t]he housing market is interconnected with economic and social life." *Id.* at 1306. Thus, the Supreme Court observed, a FHA violation could "be expected to cause ripples of harm to flow far beyond the defendant's misconduct." *Id.* (internal quotations and citations omitted). And "[n]othing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel." *Id.*

Instead, the Court concluded, "[p]roximate cause under the FHA requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (citing *Holmes v. Secs. Investor Prot. Corp.,* 503 U.S. 258, 268 (1992)). Noting its prior importation of directness principles from tort law to statutory damages claims, *id.* (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006)), the Supreme Court observed that "[t]he general tendency in these cases, in regard to damages at least, is not to go beyond the first step." *Id.* (quoting *Hemi Group, LLC v. City of New York,* 559 U.S. 1, 10 (2010)). And "[w]hat falls within that 'first step' depends in part on the nature of the statutory cause of action," *id.* (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014), as well as "an assessment of what is administratively possible and convenient," *id.* (citing *Holmes*, 503 U.S. at 268).[4]

As to how these directness principles might apply to Miami's claims, the Supreme Court declined to say, leaving for the lower courts to "define, in the first instance, the contours of proximate cause under the FHA and decide how that standard applies to the City's claims for lost property-tax revenue and increased municipal expenses." *Id.* at 1306. And that is our task here. But, at the outset, it is helpful to examine the trio of cases cited in *City of Miami—Anza, Hemi Group, and Lexmark.*

---

[4]     The latter analysis includes whether better situated plaintiffs would have an incentive to sue, whether there would be a risk of duplicative recoveries, and "the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Holmes*, 503 U.S. at 269–70.

In *Anza*, 547 U.S. 451, the plaintiff, Ideal, brought civil RICO claims against its competitor, Anza, alleging that Anza had harmed Ideal when Anza "defraud[ed] the New York tax authority" by failing to pay its share of state taxes. As Ideal saw it, because Anza had paid lower taxes to the State of New York than it was legally required to do, it was able to offer lower prices to customers, thereby taking customers away from Ideal. *See id.* Although it acknowledged that Ideal had alleged a real injury in the form of lost business, the Supreme Court nevertheless found that Ideal had failed to allege that Anza's purported violation of civil RICO was the proximate cause of its harm.

In arriving at this conclusion, the Supreme Court applied the "common-law foundations of the proximate-cause requirement" that it had articulated in *Holmes*, 503 U.S. 258, and "specifically the demand for some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 457 (quoting *Holmes*, 503 U.S. at 268). Noting "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action," the Court observed the "discontinuity" that "Ideal's lost sales could have resulted from factors other than [Anza's] alleged acts of fraud." *Id.* at 459. Finally, the Court also remarked that the "requirement of a direct causal connection is especially warranted where the immediate victims . . . can be expected to vindicate the laws by pursuing their own claims"—which, in that case, was the State of New York. *Id.* at 460.

Later, in *Hemi Group*, 559 U.S. 1, the City of New York commenced a RICO claim against certain out-of-state cigarette retailers, claiming that the defendants

had "committed fraud by selling cigarettes to city residents and failing to submit the required customer information to the State." *Id.* at 10. The City argued that it was injured because, by keeping customer information from the State, the defendants prevented the State from conveying the information to the City, and, without the information, the City "could not determine which customers had failed to pay the [City's cigarette] tax" and "could not pursue them for payment." *Id.* Pointing to its articulation in *Holmes* that "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step," *id.* at 10 (citing *Holmes*, 503 U.S. at 271-272), the Supreme Court found that the city's allegations did not satisfy the proximate cause requirement. "Here, the conduct directly responsible for the City's harm was the customers' failure to pay their taxes," while "the conduct constituting the [RICO violation] was Hemi's failure to file Jenkins Act reports." *Id.* at 11. Thus, the Supreme Court concluded, the conduct that directly caused the harm was distinct from the conduct that gave rise to the fraud. *Id.*

The last in the trio of cases is *Lexmark*, 134 S. Ct. 1377. That case involved a disputed between Lexmark, a manufacturer of printers and associated toner cartridges, and Static Control, a supplier of certain components to companies that remanufactured toner cartridges for Lexmark printers. *Id.* at 1384. These "remanufacturers" purchased used Lexmark toner cartridges, refurbished them, and sold them in competition with new and refurbished cartridges sold by Lexmark. *Id.* at 1383. Lexmark sued Static Control, and in return Static Control countersued

Lexmark, claiming that Lexmark had violated § 43 of the Lanham Act, 15 U.S.C. § 1125(a), by misleading consumers into thinking that they had to return their used Lexmark cartridges to Lexmark (as opposed to the remanufacturers) and by misleading remanufacturers into believing that they were legally prohibited from using Static Control's products to refurbish used Lexmark cartridges. *Id.* at 1384. In response, Lexmark argued that Static Control lacked standing, because the statements at issue were directed at consumers and remanufacturers and, thus, whatever injury Static Control may have suffered was too remote and not proximately caused by Lexmark. *Id.* at 1385.

The Supreme Court disagreed. Recognizing the general presumption that "a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute," the Court first observed that "the proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Id.* at 1390. But it found that Static Control satisfied the proximate cause requirement for at least two reasons. First, to the extent that Static Control alleged that Lexmark's statements harmed its reputation with its customers (*i.e.,* the remanufacturers), "the plaintiff's injury flows directly from the audience's belief in the disparaging statements." *Id.* at 1393. Second, the Supreme Court held that "Static Control adequately alleged proximate causation by alleging that it designed, manufactured, and sold microchips that both (1) were necessary for, and (2) had no other use than, refurbishing Lexmark toner cartridges." *Id.* at 1394. This was so because "[t]aking Static Control's assertions at

13

face value, there is likely to be something very close to a 1:1 relationship between the number of refurbished . . . cartridges sold (or not sold) by the remanufacturer and the number of . . . microchips sold (or not sold) by Static Control." *Id.*

Notably, the Supreme Court recognized that, because the pathway from Lexmark's alleged fraudulent statements to Static Control's injuries went through "the intervening link of injury to remanufacturers," the allegations "might not support standing under a strict application of the 'general tendency' not to stretch proximate causation 'beyond the first step.'" *Id.* (quoting *Holmes*, 503 U.S. at 271). But the Court nevertheless found that the "discontinuity" that typically existed between the injury to the direct victim and the injury to the indirect victim was absent, because "Static Control's allegations suggest that if the remanufacturers sold 10,000 fewer refurbished cartridges because of Lexmark's false advertising, then it would follow more or less automatically that Static Control sold 10,000 fewer microchips for the same reason, without the need for any speculative . . . proceedings or intricate, uncertain inquiries." *Id.* (internal quotations and citation omitted). Given these "relatively unique circumstances," the remanufacturers were not "more immediate victims[s] than Static Control." *Id.* (internal quotations and citation omitted).

All told, the directness requirement discussed in these cases "obviates the difficulty in assessing damages from indirect injuries; avoids complicated rules for apportioning damages among several injured parties with greater or lesser injuries; and provides the requisite level of deterrence for . . . tortfeasors." *RWB Servs., LLC*

*v. Hartford Computer Grp., Inc.* 539 F.3d 681, 688 (7th Cir. 2008); *see James Cape & Sons Co. v. PCC Const. Co.,* 453 F.3d 396, 403–04 (7th Cir. 2006) (stating that injury was outside the scope of proximate cause where the plaintiff could not show what portion of its lost market share was attributable to the defendant's actions). With these principles in mind, we turn to the County's claims in this case.

## B.     The County's Alleged Injuries

As HSBC sees it, the various injuries alleged by the County are too attenuated from HSBC's alleged discriminatory loan origination practices to satisfy the proximate cause requirement under the FHA. It is simply too "speculative," HSBC argues, to believe that the purported predatory lending practices would inexorably lead to increased foreclosures, or that such foreclosures would lead to vacant lots and urban blight, much less result in additional costs to the County.

For its part, the County counters that HSBC focuses too myopically on its origination activities, while ignoring the other components of the alleged predatory lending program, such as HSBC's discriminatory servicing, loss mitigation, and foreclosure practices, which are more closely linked to the resulting foreclosures and alleged harms. And, where the relationship between the harms and the challenged conduct may be more attenuated, the County urges the Court to be mindful of the statutory purposes of the FHA, which are broader and more remedial than those of RICO and the Clayton Act. To HSBC, it is the County that engages in a sleight of hand, and HSBC argues that the Complaint lacks any allegations that it

discriminated against minority borrowers in servicing loans and prosecuting foreclosures.

But the Complaint does assert that HSBC engaged in loan servicing and foreclosure-related practices that discriminated against minorities. For example, the County alleges that HSBC engaged in discriminatory loan servicing and loss mitigation practices that resulted in more foreclosures for minority borrowers as compared to nonminority borrowers. *See, e.g.,* 2d Am. Compl. ¶ 292. The County also claims that HSBC discriminated against minority borrowers in the way it handled the resulting foreclosure proceedings. *Id.* Moreover, the County supports these claims with preliminary HMDA data indicating—at least in the County's eyes—that HSBC foreclosed on minorities at higher rates than similarly situated white homeowners. *See id.* ¶¶ 262–305.

What is more, according to the County, HSBC's racially discriminatory loan servicing and loss mitigation practices were "part and parcel" of its overall predatory lending scheme directed at minority communities. *See* 2d Am. Compl. at ¶¶ 291, 350–73, 388–96; *see generally* 2d Am. Compl; *see also Dekalb Cty. v. HSBC N. Am. Holdings, Inc.*, 2013 WL 7874104, at *10 (N.D. Ga. Sept. 25, 2013) (describing complaint as alleging that foreclosure and loan servicing were "the last component" of a discriminatory subprime lending program). In short, as portrayed in Counts I and II, HSBC engaged in a comprehensive equity-stripping program targeted at minority borrowers by engaging in predatory loan origination practices as well as discriminatory loan servicing practices (including less-favorable loss

mitigation and race-based foreclosure practices), all of which resulted in more foreclosures for minority borrowers. *See* 2d Am. Compl. ¶¶ 350–73, 388–96.[5]

In this way, the allegations differ materially from those in *City of Miami*, where the City relied solely on the lenders' initial loan origination practices. *See City of Miami,* 137 S. Ct. at 1301; *City of Miami*, 2014 WL 3362348, at *5. That left open the possibility that the foreclosures in Miami could have been caused by a wide array of factors outside of the lenders' control. In contrast, here, the County has pointed to HSBC's purportedly discriminatory loan servicing, loss-mitigation, and foreclosure practices, which the County contends are more directly linked to the greater number of foreclosures experienced by minority borrowers.

From this, the question becomes whether the County alleges a sufficiently direct relationship between HBSC's conduct and the various injuries it claims it has suffered. As explained below, the Court concludes that several of the County's claimed injuries are too attenuated from HBSC's challenged conduct to proceed, while others bear a sufficiently direct relationship to the alleged wrongs to survive HSBC's motion to dismiss.

### 1. Certain "Out-of-Pocket" Costs

The County asserts that it has suffered damages in the form of certain out-of-pocket costs, including the costs associated with serving eviction notices, conducting

---

[5] HSBC cites to *Hemi*, 559 U.S. at 13, for the proposition that a plaintiff may not simply claim that a particular action was part of a general "scheme" to evade the proximate-cause requirement. Defs.' Mem. Supp. at 7. But, in *Hemi*, the plaintiff relied upon acts other than the predicate acts that actually gave rise to the RICO claim in order to establish proximate cause. Here, the County has alleged that HSBC's servicing, loss mitigation, and foreclosure practices were, in and of themselves, discriminatory.

judicial and administrative foreclosure procedures, and registering and inspecting foreclosed homes. Assuming the truth of the County's allegations, the relationship between HSBC's discriminatory actions (such as its servicing and foreclosure practices related to minority borrowers' loans) and these additional costs is clear: HSBC's discriminatory conduct forced more minority borrowers into foreclosure proceedings, and this caused the County to incur more foreclosure-related costs than it would have otherwise. The County is therefore within the "first step" of injury. *Cf., e.g., Hemi*, 559 U.S. at 10–12.

A review of what is "administratively possible and convenient," *see City of Miami*, 137 S. Ct. at 1306; *Holmes*, 503 U.S. at 268, confirms this conclusion. There is little risk of duplicative recovery because the injury flowed directly to the County. Nor is there a better situated plaintiff that would have an incentive to sue or could be counted on to vindicate the law. *See Holmes*, 503 U.S. at 269–70. Additionally, the County plausibly alleges that statistical analysis of data obtained from HSBC in discovery will allow it to prove which of HSBC's foreclosures were discriminatory and that it can tally its out-of-pocket expenses for those foreclosures. *Cf., e.g., Hartford Computer Grp.,* 539 F.3d at 688 (noting that indirect injuries are likely to present difficulty in assessing and attributing damages). Of course, discovery may reveal otherwise, but the County's allegations as to these particular out-of-pocket damages are sufficient to survive the pleading stage.

## 2. Costs of Social Services to Foreclosed Homeowners

The County's claim for the costs of social services it provided to foreclosed minority homeowners is more complicated. Whether and to what extent the County needs to provide services to foreclosed homeowners presumably depends on a multitude of factors individual to each homeowner. For example, some borrowers may have had other assets, continuing employment, or access to funds that allowed them enough money for housing, food, and other necessities, even after foreclosure. Others may have decided to move out of the County altogether looking for better opportunities. Still others may have faced dire financial and personal hardship as a result of the discriminatory practices and required a great deal of County assistance. Whatever the case, to the extent that the County incurred additional costs for social services, such injuries are derivative of the injury that HSBC caused to the minority borrowers themselves and, therefore, insufficient to satisfy the directness requirement.[6] *See Mendelovitz*, 40 F.3d at 187; *see also Sidney Hillman*, 192 F. Supp. 3d at 971–72 (finding proximate cause not satisfied where "establishing damages would require individualized inquiries . . . creating difficulties in assessing damages that the directness requirement was intended to prevent").

---

[6] To the extent the County may be more or less automatically required to provide certain services to foreclosed homeowners regardless of their injuries, that might change the analysis. *See BCS Servs., Inc.*, 637 F.3d at 757 (observing that a "straightforward" intervening cause and effect did not "weaken the inference" of proximate causation); *Sidney Hillman*, 192 F. Supp. 3d at 971 (citing *BCS Servs, Inc.* for the proposition that "automatic" intervening events can be discounted in a proximate cause analysis). However, the County does not make that allegation, nor does it allege sufficient facts to allow the Court to draw that inference.

In response, the County argues that, by its terms, the FHA warrants a more expansive definition of proximate cause than the definition utilized in the Supreme Court cases discussed above and asks the Court to consider whether there are better suited plaintiffs to recover for damages and whether the goal of deterrence would be served. *See Holmes*, 503 U.S. at 269–70 (instructing courts to consider these factors to help inform what falls within the "first step").

As to the first inquiry, there is no obvious, better-suited plaintiff— governmental or private—to recover the damages that the County seeks here. That said, the goal of deterring similar discriminatory conduct would be adequately served in this case, even if the County could not recover its costs of social services to foreclosed homeowners. The County has other viable claims of injury, and HSBC will be subjected to significant discovery, as well as the risk of significant financial loss and public disrepute. Therefore, expanding proximate cause beyond the traditional "first step" for this claim would only marginally, if at all, increase deterrence and would likely be outweighed by the difficulties of establishing causation as outlined above. Accordingly, HSBC's motion to dismiss as to the County's claim for increased social services costs is granted.

### 3. Loss of Property Tax Revenue from Foreclosed Properties

The County's claim for lost property tax revenue on HSBC-foreclosed properties[7] fares no better. To the extent the County is alleging that it suffered

---

[7] The County alleges "lost property tax revenue on . . . properties that have not been recovered via tax lien sales," 2d Am. Compl. ¶ 321, and "the erosion of Plaintiff's tax base due to reduced property values on foreclosed properties . . .," *id*.

because HSBC's conduct harmed minority borrowers by causing unnecessary foreclosures and, as a result, the minority borrowers no longer paid property taxes to the County, this claim falls squarely within the Supreme Court's holding in *Hemi*. The harms caused by HSBC to the minority borrowers were direct, while the injury of unpaid taxes to the County was indirect. Indeed, there could be a number of intervening factors that would need to be accounted for. For example, some homeowners may have been behind in paying their real estate taxes (due to financial difficulties) even before the foreclosures. There could be instances where the property was purchased soon after the foreclosure and any outstanding property taxes were then paid. There could be instances where the servicing company paid the outstanding property taxes post-foreclosure. These are just a few illustrations of the indirectness of the County's harm.

To the extent the County's claim of injury from lower tax revenue is predicated not on a homeowner's failure to pay, but rather on a diminishment in a property's value post-foreclosure, this introduces significant concerns about measuring the diminishment in value attributable to HSBC's conduct, as opposed to other external factors, such as the state of the general real estate market and the demand for houses on a neighborhood by neighborhood basis. *See, e.g., James Cape & Sons Co.*, 453 F.3d at 403–04 ("[Plaintiff] cannot show what portion of its 'lost market share' is attributable to the bids lost to the bid-rigging scheme"); *Cty. of Cook v. Wells Fargo & Co.*, 115 F. Supp. 3d 909, 920 (N.D. Ill. 2015) (stating that

the County's claim to a reduced property tax base "failed to plausibly allege that [the] injur[y] w[as] proximately caused by" defendant lender's actions).

For these reasons, the Court holds that the County has pleaded insufficient facts to establish that its claim for lost property tax revenue is sufficiently direct, and HSBC's motion to dismiss this claim is granted.

### 4. Loss of Property Tax Revenue from Abandoned and Vacant Properties

The County also seeks to recover lost tax revenue from abandoned or vacant properties. Because the County distinguishes these properties from foreclosed properties, *see* 2d Am. Compl. ¶ 321, the Court presumes that the County refers to abandoned or vacant properties in the vicinity of homes foreclosed upon by HSBC. The County's causation theory as to these properties is similarly unilluminated by the Complaint, and it is unclear how HSBC's conduct would be the but-for cause of the failure or inability of these homeowners to pay their property taxes. And, to the extent the County's claim of injury from lower tax revenue might instead be predicated on a diminishment in the value of these properties, this claim too raises a myriad of possible intervening causes. HSBC's motion to dismiss this claim of injury is accordingly granted.

### 5. Loss of "Various Revenue" from Abandoned or Vacant Properties

Additionally, the County seeks to recover for a loss of unspecified "various revenue" (separate from property tax revenue) from abandoned or foreclosed properties. *Id*. But it is unclear from the Complaint exactly what the County

means by "various revenue," and the Court is unable to determine if this injury falls within the scope of proximate cause of HSBC's alleged conduct. Thus, HSBC's motion to dismiss this claim of injury is granted.

### 6. Diminution of Property Values of Other Homes

If the administrative difficulty in measuring and apportioning to the County the damages from a reduction in property value on HSBC-foreclosed homes appears daunting, the difficulties with surrounding homes is all the more so. The County's injuries would be derivative of any number of external factors as well as the conduct of other homeowners and lenders. *See, e.g., James Cape & Sons*, 453 F.3d at 403–04; *Cty. of Cook*, 115 F. Supp. at 920; *see also Hartford Computer Grp.,* 539 F.3d at 688. HSBC's motion to dismiss this claim of injury is accordingly granted.

### 7. Costs of Demolishing Foreclosed Homes

The County asks the Court to award it the costs it incurred in demolishing homes of minority borrowers that were subject to HSBC foreclosures. But the County's decision to demolish a home also may be dependent upon any of number intervening factors, such as the condition of the house pre-foreclosure, whether the home was vandalized or otherwise in disrepair post-foreclosure while it was waiting sale, and the strength of the local housing market. *See, e.g., James Cape & Sons*, 453 F.3d at 403–04; *Cty. of Cook*, 115 F. Supp. at 920; *see also Hartford Computer Grp.,,* 539 F.3d at 688. Furthermore, the Complaint does not provide any description of how HSBC's alleged conduct led to the demolitions. Accordingly, HSBC's motion to dismiss claims as to this injury is granted.

### 8. Urban Blight

The County also seeks damages for the "necessary reallocation" of its resources and other injuries to the fabric of its communities arising from "the resulting urban blight." 2d Am. Compl. ¶ 33. But the line from HSBC's alleged discriminatory conduct to "urban blight" winds through too many other potential causes—such as the economic downturn in 2008, the general state of the communities before and after the foreclosures at issue, and the impact of the Great Recession on these communities—to satisfy the proximate cause requirement. HSBC's motion to dismiss this claim of injury is accordingly granted.

### 9. Recording, Transfer, and Intangible Fees

Lastly, the County claims that it lost recording, transfer, and intangible fees due to HSBC's practice of using the MERS database to track, transfer and trade mortgage loans in furtherance of its discriminatory scheme. *Id.* ¶¶ 204–13. Assuming that HSBC's use of the MERS database was improper, the County states a squarely direct relationship between HSBC's use of the MERS database and the County's resulting loss of recording income. As such, HSBC's motion to dismiss as to these injuries is denied.[8]

---

[8] HSBC also asserts, in passing, that the County is barred from recovering any costs for municipal services under the "municipal cost recovery rule" (or "free public services doctrine"). Defs.' Mem. Supp. at 9 n.6. In support, HSBC cites to the Illinois Supreme Court case *City of Chi. v. Beretta U.S.A.*, 821 N.E.2d 1099, 1144 (Ill. 2004). But HSBC provides no explanation as to why state law would govern this issue in an FHA case, nor does it cite to any Seventh Circuit authority on this issue. *See* Defs.' Mem. Supp. at 9 n.6. Given the perfunctory nature of HSBC's argument, the Court finds that it has been waived. *See, e.g., Kudlicki v. MDMA, Inc.*, No. 05 C 2589, 2006 WL 1308617, at *2 n.1 (N.D. Ill. May 10, 2006) (finding "cursory" argument "buried in footnote" waived) (citing *Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped

### D. Summary of Proximate Cause

In sum, the Court holds that the County has plausibly alleged that the additional costs that it incurred to serve eviction notices, conduct judicial and administrative foreclosure procedures, and register and inspect foreclosed homes were proximately caused by HSBC's alleged discriminatory conduct. Additionally, the County has also plausibly alleged that its loss of recording, transfer, and intangible tax income were proximately caused by HSBC's allegedly improper use of MERS as part of its predatory lending program. HSBC's motion to dismiss the County's other alleged injuries is granted.

## II. The County's Disparate-Treatment Claim

HSBC also seeks to dismiss the County's disparate-treatment claim. Defs.' Mem. Supp. at 3 n.3. In doing so, HSBC asserts in a cursory footnote that the County's disparate-treatment allegations "fail to meet applicable pleading standards." *Id*. To find its argument, HSBC refers the Court to its motion to dismiss the County's Amended Complaint, ECF No. 49-1, which preceded the Complaint now before the Court. In that motion, HSBC argued that the County had not pleaded a disparate-treatment claim because it had alleged that HSBC's objective was to "maximize profits" rather than to render adverse effects upon an identifiable group. Defs.' Mem. Supp. Mot. Dismiss Am. Compl. at 19. In effect, HSBC asks the Court to import its argument from a prior motion to dismiss and

arguments are waived.")). In any event, as *Beretta* observes, the municipal cost recovery rule has significant exceptions, requiring a fact-bound analysis beyond what is provided in the pleadings. 821 N.E.2d at 427–31.

apply it to the County's substantially revised 397-paragraph Complaint, which, *inter alia*, includes a new, standalone disparate-treatment claim (Count III). However, this is not the Court's responsibility. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman–Spencer Agency, Inc.,* 845 F.3d 313, 321 (7th Cir. 2017) ("[P]erfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *see also, e.g., Godbole v. Ries,* No. 15 C 5191, 2017 WL 219506, at *2 (N.D. Ill. Jan. 19, 2017) ("The Court is not required to construct arguments for [parties].") (citing *Pine Top Receivables of Ill., LLC v. Banco de Seguros del Estado,* 771 F.3d 980, 987 (7th Cir. 2014)). HSBC's argument is therefore waived, and its motion to dismiss the County's disparate treatment claim warrants rejection on this ground alone.

That said, the Complaint sufficiently states a claim for disparate treatment under the FHA. Under the FHA, it is "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race . . . ." 42 U.S.C. § 3605(a). To state a disparate treatment claim under the FHA requires allegations "of intentional discrimination, provable via either direct or circumstantial evidence." *Daveri Dev. Grp., LLC v. Vill. of Wheeling*, 934 F. Supp. 2d 987, 997 (N.D. Ill. 2013) (citing *Nikolich v. Vill. of Arlington Heights, Ill.*, 870 F. Supp. 2d 556, 562 (N.D. Ill. 2012)); *see Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010) ("[Plaintiff's FHA] complaint identifies the type of discrimination that she thinks occurs (racial),

by whom, and when. This is all that she needed to put in the complaint."); *see also Wigginton v. Bank of Am. Corp.*, 770 F.3d 521, 522 (7th Cir. 2014) (stating that an FHA plaintiff must allege that HSBC treated protected-status individuals differently from others).

As described above, the County has identified specific practices by which HSBC intentionally targeted, marketed, originated, serviced, and foreclosed on predatory subprime loans provided to minority borrowers, on terms different from loans provided to similarly situated non-minority borrowers. *See, e.g., City of L.A. v. Citigroup Inc.*, 24 F. Supp. 3d 940, 953 (C.D. Cal. 2014) (finding Los Angeles's allegations that "Defendants targeted minority borrowers for unfair loan terms based on race or national origin" and "numerous allegations of statistical patterns of discrimination" to "ampl[y]" state a disparate-treatment claim); *City of L.A. v. Wells Fargo & Co.*, 22 F. Supp. 3d 1047, 1059–60 (C.D. Cal. 2014) (same); *City of L.A v. Bank of Am. Corp.*, No. 13 C 9046, 2014 WL 2770083, at *11 (C.D. Cal. June 12, 2014) (finding allegations that "Defendants targeted African-American and Latino borrowers for unfair loan terms on the basis of their race" sufficient at pleading stage). Therefore, even if HSBC had not waived the argument, its motion to dismiss the County's disparate-treatment claim would be denied.

## III. The County's Disparate Impact Claims

HSBC also challenges the County's disparate impact claims. Specifically, HSBC contends that *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015), created a four-part "prima facie" requirement to

plead disparate impact claims and that the County has failed to plead these requirements. Defs.' Mem. Supp. at 12. In support, HSBC cites to a district court case which applied the four-part test and urges this Court to do the same. *See Cobb Cty. v. Bank of Am. Corp.*, 183 F. Supp. 3d 1332, 1346 (N.D. Ga. 2016). Moreover, HSBC argues that the County has not stated a disparate impact claim because it also alleges intentional discrimination by HSBC. Defs.' Mem. Supp. at 13 (citing *City of Miami v. Bank of Am. Corp.,* 171 F. Supp. 3d 1314, 1320 (S.D. Fla. 2016)).

In *Inclusive Communities*, the Supreme Court held that disparate impact claims are cognizable under the FHA and set out four requirements that plaintiff must meet to make out a *prima facie* case of disparate impact. *See* 135 S. Ct. at 2523–24. But the requirement to establish a *prima facie* case applies only at the summary judgment stage. To adequately plead a disparate impact claim, the Supreme Court in *Inclusive Communities* stated only that a plaintiff must allege facts sufficient to support a causal connection between the challenged policy or policies and a disparate impact upon members of a protected class. *Id.* at 2523; *see also Winfield v. City of New York*, No. 15 C 5236, 2016 WL 6208564, at *5–6 (S.D.N.Y. Oct. 24, 2016) ("[A] *prima facie* case is an evidentiary standard, and not a pleading requirement. [*Inclusive Communities*] did not alter the plausibility standard for pleading, which requires only the plaintiff plead allegations that plausibly give rise to an inference that the challenged policy causes a disparate impact.").[9]

---

[9]    In the *Cobb County* case, the district court applied the four-part test in dismissing the plaintiff's disparate impact claim. *See Cobb Cty.*, 183 F. Supp. 3d at 1346-47. However,

To this point, HSBC raises two primary arguments. First, it contends that the County failed to identify any particular policy employed by HSBC that caused a disparate impact to minority borrowers. But the Complaint is replete with examples of HSBC policies that, according to the County, resulted in a disparate impact on minority borrowers. These include: HSBC's mortgage lending and services policies; pricing and marketing policies; various underwriting policies; loan servicing and loss mitigation policies; and foreclosure-related policies.

Undeterred, HSBC contends that much of the challenged conduct was "discretionary" and that "[d]iscretion alone may not form the basis of a disparate impact claim." Defs.' Mem. Supp. at 12–13. But the Complaint includes many policies that were not completely discretionary, and to the extent HSBC employees were given a degree of discretion to implement these policies in any individual instance, a uniform grant of discretion can form the basis of a disparate impact claim. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011) (recognizing that, in certain cases, "giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory");[10] *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 991 (1988) (stating that the defendants' "subjective or discretionary . . . practices may be analyzed under the disparate impact approach" in Title VII cases); *City of Phila. v. Wells Fargo & Co.,* No. 17 CV 2203, 2018 WL

---

as discussed above, the only pleading requirement discussed in *Inclusive Communities* was the need to plausibly allege a causal connection between a defendant's conduct and the alleged disparate impact. Accordingly, the Court respectfully disagrees with the district court's decision in *Cobb County*.

[10] Title VII and the FHA are to "be given like construction and application." *Kyles v. J.K. Guardian Sec. Servs., Inc.,* 222 F.3d 289, 295 (7th Cir. 2000).

424451, at *4 (E.D. Pa. Jan. 16, 2018) (rejecting the same argument made by defendant lender based upon *Dukes*, 564 U.S. at 355, and *Watson*, 487 U.S. at 990–91).

Second, HSBC argues that, to the extent the County has pointed to specific policies, it has not sufficiently alleged a causal link between the policies and a disparate impact. In support, HSBC points to the fact that the Complaint relied upon "general allegations common to all lenders," rather than HSBC-specific data. But even assuming, *arguendo*, that statistics from multiple mortgage lenders would be insufficient, HSBC's argument is incorrect. In addition to offering statistics from multiple mortgage lenders, the County also provides data particularized to HSBC loans and foreclosures. *See* 2d Am. Compl. ¶¶ 262–305. Coupled with the extensive allegations in the Complaint that describe how HSBC's policies resulted in the statistical disparities, the County has asserted sufficiently the existence of a causal connection between the policies and the statistical data to survive a motion to dismiss.

In addition, HSBC contends that the County's disparate impact claims must fail because the County also alleges that HSBC engaged in intentional discrimination. Defs.' Mem. Supp. at 13. But this, too, is unavailing for several reasons.

First, a plaintiff may allege claims in the alternative. *See* Fed. R. Civ. P. 8(d)(2). Second, although a plaintiff is not required to explicitly allege, or, ultimately, to prove intent as part of a disparate-impact theory, a plaintiff is not

precluded from doing so. In fact, one of the factors that a court considers to determine whether a plaintiff has made a *prima facie* disparate impact case is "the presence of some evidence of discriminatory intent, even if circumstantial and less than sufficient to satisfy" the standards required for disparate treatment. *See Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977); *Bloch v. Frischhlz,* 587 F.3d 771, 784 (7th Cir. 2009); *City of Joliet v. Mid-City Nat'l Bank of Chi.*, No. 5 C 6746, 2014 WL 4667254, at *24 (N.D. Ill. Sept. 17, 2014), *aff'd sub nom. City of Joliet, Ill. v. New W., L.P.*, 825 F.3d 827 (7th Cir. 2016). It is not surprising, then, that numerous other courts have allowed similar disparate impact claims to survive a motion to dismiss. *See, e.g., Bank of Am. Corp.*, 2014 WL 2770083, at *11 (permitting disparate impact claim to proceed where municipality alleged, *inter alia*, that the defendants "targeted" minority neighborhoods); *City of Memphis v. Wells Fargo Bank, N.A.*, No. 9–2857–STA, 2011 WL 1706756, at *14 (W.D. Tenn. May 4, 2011) (same, where municipality alleged, *inter alia*, that the defendants "steered" borrowers to its predatory loan offerings).

For these reasons, HSBC's motion to dismiss the County's disparate impact claims is denied.

## IV. Statute of Limitations

HSBC also argues that the County's claims are barred by the statute of limitations. The FHA provides that "[a]n aggrieved person may commence a civil action . . . not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice . . . whichever occurs last." 42 U.S.C. §

3613(a)(1)(A).  The County filed its lawsuit on March 21, 2014, and therefore the relevant two-year period reaches back to March 21, 2012.  According to HSBC, the County's claims are "principally" based on loans originated between 2003 and 2007.  Defs.' Mem. Supp. at 14.  Moreover, HSBC asserts—again by referring the Court to the prior motion to dismiss—that the continuing violation doctrine does not apply here.[11]  *Id*. at 15.

The County responds that the continuing violation doctrine brings its claims within the statute of limitations for two reasons: (1) as to Counts I and III, HSBC's discriminatory conduct does not cease until the last payoff, default, or foreclosure as to each of the loans initiated between 2003 and 2007; and (2) as to Count II, HSBC's discriminatory foreclosure activities continue to this day.  Pls.' Resp. at 2–3.

Dismissing a claim at the pleading stage based upon a statute of limitations defense is typically disfavored.  *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004) ("[W]here a defendant raises the statute of limitations as an affirmative defense at the motion to dismiss stage, a court can only dismiss a claim when [the] complaint plainly reveals that an action is untimely under the governing statute of limitations."); *Thompson v. City of Chi. Bd. Educ.*, No. 14 CV 6340, 2016 WL 362375, at *8 (N.D. Ill. Jan. 29, 2016) ) ("[A] district court may dismiss a claim under Rule 12(b)(6) as untimely if the complaint reveals that the claim is unquestionably untimely.") (citing *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2015)); *Jovic v. L-3 Servs., Inc.*, 69 F. Supp. 3d 750, 765 (N.D. Ill. Sept. 24,

---

[11]     The rest of HSBC's argument on this issue is a rehash of its arguments for why the County does not state a disparate impact or disparate treatment claim.  *Id*.

2014) (quoting *Andonissamy v. Hewlett–Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008)). This rule, of course, applies to FHA claims. *See, e.g.*, *Jafri v. Chandler LLC*, 970 F. Supp. 2d 852, 865 (N.D. Ill. 2013) (stating that a "limitations defense fails at the pleadings stage" where the complaint does not admit the ingredients of a statute of limitations defense).

"[W]here a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380–81 (1982).

Here, each of the County's counts includes plausible allegations that HSBC continues to service and foreclose on loans in a discriminatory manner. Accordingly, adjudication of HSBC's statute of limitations defense must await summary judgment. *See Dekalb Cty.*, 2013 WL 7874104, at *11 (holding that statute of limitations issue should be resolved at summary judgment, where plaintiff municipality alleged discriminatory foreclosure and loan servicing as "the last component" of defendants' alleged predatory program); *City of L.A.*, 24 F. Supp. 3d at 951–52 (finding, at motion-to-dismiss stage, that similar allegations fell within the statute of limitations under the continuing violations doctrine); *Bank of Am. Corp.*, 2014 WL 2770083, at *7 (finding similar allegations "sufficient . . . to support the continuing violations doctrine" at the pleading stage).

## V.    Dismissal of Non-Originating Entities

HSBC also asks the Court to dismiss HSBC USA Inc., HSBC Finance Corporation, HSBC North America Holdings Inc., HFC Company LLC, and Beneficial LLC.  *See* Defs.' Mem. Supp. at 1 n.1.  Again, HSBC simply refers the Court, via a footnote, to its motion to dismiss the County's preceding Amended Complaint.  *Id*.  There, HSBC argued that these entities should be dismissed because the County does not allege that the entities originated any mortgage loans. Defs.' Mem. Supp. Mot. Dismiss Am. Compl. at 19–20.

But, again, the County's claims are not limited to these entities' loan-origination practices.  In any event, the Complaint does allege that three of the five entities originated mortgage loans.  2d Am. Compl. ¶ 44 (HFC Company LLC); ¶ 20 (Household Finance Company, "now, Defendant HSBC Finance Corporation"); ¶ 43 (Beneficial LLC).  And, given HSBC's failure to address the specific allegations in the Complaint with any particularity, the Court will not scour through it to determine if the County has adequately pleaded a veil-piercing theory as to the remaining two entities—HSBC USA Inc. and HSBC North America Holdings Inc. HSBC's argument for dismissal of non-originating entities is accordingly waived, and HSBC's request to dismiss these entities is denied.  *See M.G. Skinner*, 845 F.3d at 321; *see, e.g., Kudlicki v. MDMA, Inc.*, No. 05 C 2589, 2006 WL 1308617, at *2 n.1 (N.D. Ill. May 10, 2006) (finding "cursory" argument "buried in footnote" waived).

## Conclusion

For the reasons provided herein, the Court grants in part and denies in part HSBC's motion to dismiss [137] the County's Second Amended Complaint. HSBC's motion is granted as to the following claimed injuries: the County's costs of providing social services to homeowners; costs of demolishing homes; loss of property tax revenue from foreclosed, abandoned and vacant properties; loss of "various revenue" from abandoned or foreclosed properties; diminution of the tax base due to foreclosed homes and surrounding properties; and the costs associated with urban blight. The motion is denied with respect to the County's claimed injuries resulting from HSBC's allegedly improper use of the Mortgage Electronic Registration System, Inc., as well as the additional costs the County incurred for the administration of foreclosure proceedings that resulted from the challenged practices, including the costs of serving eviction notices, conducting judicial and administrative foreclosure procedures, and registering and inspecting foreclosed homes. The motion also is denied in all other respects.

**SO ORDERED.**                              **ENTERED:  5/30/18**

_____
**JOHN Z. LEE**
**United States District Judge**